IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Earl A. CHARLTON, Attorney at Law.†

Supreme Court

*No. 87–1021–D. Submitted on briefs March 9, 1993.—Decided
April 26, 1993.*

(Also reported in 498 N.W.2d 380.)

†Motion for reconsideration denied May 25, 1993.

For Earl A. Charlton, there were briefs by *Terry E. Johnson* and *Peterson, Johnson & Murray, S.C.*, Milwaukee.

For the Board of Attorneys Professional Responsibility there was a brief by *James J. Winiarski*, Milwaukee.

PER CURIAM. *Attorney disciplinary proceeding; attorney's license revoked.*

Attorney Earl A. Charlton appealed from the referee's findings of fact, conclusions that he engaged in professional misconduct and recommendation that his license to practice law in Wisconsin be revoked as discipline for that misconduct. Attorney Charlton's misconduct consisted of the following: accepting employment and representing clients in numerous business deals and in connection with a trust in which the exercise of his professional judgment on the clients' behalf was or was likely to have been adversely affected by his representation of others in the same matters or by his own financial, business, property or personal interests without making full disclosure to the clients and obtaining their informed consent; engaging in conduct involving dishon-

esty, fraud, deceit or misrepresentation in several of those matters; attempting to interfere with the court's disciplinary process; neglecting a client's legal matter; failing to maintain proper records of his client trust account; failing to cooperate with the Board of Attorneys Professional Responsibility (Board) during its investigation into his conduct in these matters.

The referee's findings and conclusions addressed 13 counts of alleged misconduct set forth in the Board's complaint in this proceeding, two of which the referee recommended be dismissed, having determined that the evidence presented to establish the misconduct alleged was not clear and convincing. The Board did not appeal from that recommendation.

We adopt the referee's findings of fact and conclusions of law in respect to all but one of the remaining 11 counts alleged in the Board's complaint. So doing, we reject Attorney Charlton's numerous arguments, including his position that laches bars this proceeding, his claim of denial of due process and his contention that many of the referee's findings of fact are clearly erroneous and most of the conclusions of law are not supported by sufficient findings.

We determine that the license revocation recommended by the referee is the appropriate disciplinary response to Attorney Charlton's numerous acts of professional misconduct. By that misconduct, Attorney Charlton has demonstrated a propensity to place his personal interests, especially his financial ones, above the interests of those he has undertaken to represent and to misrepresent matters to further his own interests. In addition, he has shown a willingness to subvert the court's process established to protect the public's interest in obtaining competent, ethical legal representation. His professional misconduct considered in this proceed-

ing establishes Attorney Charlton's unfitness to be licensed by this court to practice law in the state. Accordingly, we revoke his license to do so.

Attorney Charlton was admitted to practice law in Wisconsin in 1950 and practices in Milwaukee. He has not previously been the subject of a disciplinary proceeding. While this proceeding was pending and after 25 days of hearing, the referee, the Honorable William C. Sachtjen, died. The court then appointed Attorney Norman Anderson as referee, who determined that a *de novo* disciplinary hearing was warranted. Based on the testimony presented during 24 days of hearing and the evidence in the record, the referee made findings of fact and conclusions of law concerning Attorney Charlton's professional misconduct as follows.

(1) In 1976, Attorney Charlton was retained by several individuals to incorporate a restaurant operation. Soon thereafter, he represented a bank and a small business investment company, in each of which he was a shareholder and had served as an officer and director, in making loans to the restaurant corporation in the amounts of $50,000 and $80,000, respectively. In return, the bank received a security interest in the restaurant's equipment, fixtures, inventory and other personal property; the investment company received 25 percent of the outstanding stock of the restaurant corporation, which Attorney Charlton was to represent on its board of directors, and a security interest in its equipment subordinate to the bank's. The proceeds of the loans were used to purchase the restaurant equipment from prior owners and to commence operation of the restaurant.

The following year, Attorney Charlton represented the corporation in obtaining two loans from individuals. The restaurant corporation gave a group of those individuals a "first secured interest" in its personal property.

In addition, Attorney Charlton personally guaranteed the loans. In the years following, Attorney Charlton, in his personal capacity, and two of the owners of the restaurant corporation incorporated five other restaurant businesses, in each of which Attorney Charlton became a shareholder, officer and director.

In June, 1979, a close friend of Attorney Charlton, who had retained him for many years as legal counsel and at the time was being represented by him in various legal matters, entered into an agreement with the original restaurant corporation for the sale and leaseback of all of its equipment. The client and Attorney Charlton previously had been involved together in many investments and business enterprises and for several years were controlling shareholders of the investment company that had made the $80,000 loan to the restaurant corporation. Attorney Charlton represented both this client and the corporation in the sale-leaseback and prepared documentation for the transaction.

The referee specifically found that while the client knew Attorney Charlton also represented the restaurant corporation in the deal, there was no evidence that prior to the transaction Attorney Charlton had advised him of the extent of his personal involvement in the restaurant chain or the possible effects of his dual representation. Further, Attorney Charlton failed to advise the client of the several existing security interests in the equipment that was the subject of the sale-leaseback, did not inform him of the financial condition of the restaurant or of the restaurant chain in which he had an ownership interest and did not disclose his personal guarantees of the corporation's obligations.

At the closing of the sale-leaseback, the client paid $100,000 and received a bill of sale warranting that the corporation was owner of the restaurant equipment free

of encumbrances, even though Attorney Charlton knew the equipment already was subject to two security interests, both of which had been perfected, and that the loans underlying them had not been repaid. Attorney Charlton also was aware of other possibly perfected security interests in the equipment in the name of the individuals who had made loans to the corporation. In addition to the bill of sale, Attorney Charlton gave the client a letter stating that he would furnish a "legal opinion" that the client owned the restaurant's personal property "free and clear of any liens" and that he would see to the filing of the appropriate papers.

The restaurant's obligation under the sale-leaseback was, in part, guaranteed by Attorney Charlton, who was given the right to purchase the equipment for $1 at the end of the lease term. At the closing, Attorney Charlton's law firm issued an opinion letter to the client stating that the transaction was a true lease for tax purposes.

At the disciplinary hearing, Attorney Charlton testified that the $100,000 proceeds of the transaction were to be used to pay the loans for which the prior security interests in the restaurant equipment had been given; instead, the money was given to the restaurant management and was never accounted for. The day after the closing, the restaurant corporation paid Attorney Charlton's law firm $10,000 and soon thereafter $10,100. Attorney Charlton was unable to recall the reason for those payments but insisted they were repayment of a personal loan to the restaurant he had made through his law firm.

When the sale-leaseback transaction closed, Attorney Charlton was a substantial shareholder in all of the restaurants except the one whose equipment was the subject of the transaction. At the time, all of the restaurants had substantial debt and were unable to meet cur-

rent obligations; evidence disclosed that two months after the sale-leaseback, the indebtedness of the restaurants exceeded $2,000,000. Attorney Charlton had personally guaranteed a substantial portion of that debt and had pledged his own real estate in connection with it. Further, his friends and other clients had loaned money to the restaurants and he had personally guaranteed many of those loans.

In the fall of 1980, after the restaurant corporation had failed to make any of the payments required under the lease, the undisclosed security interests in the equipment remained unsatisfied and the client still had not received title to that equipment free and clear of any liens, Attorney Charlton took an assignment of the client's interest in the sale-leaseback, giving the client his unsecured personal note for the total value of the lease. He back-dated the assignment and the note to June 12, 1979, the day after the sale-leaseback transaction closed, and at the disciplinary hearing testified that he owned the sale-leaseback interest after that date and ultimately "forgave" the restaurant's obligation under it.

Attorney Charlton also testified that the client entered into a novation of the assignment in November, 1979, forgiving Attorney Charlton's indebtedness on his personal note and agreeing to look to a corporate successor of the restaurant corporation for payment. Attorney Charlton also claimed that the sale-leaseback transaction was never consummated and was not a true lease but merely a loan to the restaurant corporation. The referee found Attorney Charlton's contentions "incredible." The referee also rejected Attorney Charlton's claim that there was no attorney-client relationship between him and the buyer-lessor.

The referee concluded that Attorney Charlton accepted employment in this matter, on behalf of the

lenders in respect to the loans to the restaurant corporation and on behalf of his client in the sale-leaseback transaction, when the exercise of his professional judgment on their behalf would or reasonably might have been affected by his own financial, business, property or personal interests or by his representation of others, in violation of SCR 20.24(1)[1] and 20.28(1).[2] The referee further concluded that Attorney Charlton engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of SCR 20.04(4),[3] by preparing

---

[1] Because most of the conduct at issue in this proceeding occurred prior to 1988, many of the applicable rules of attorney conduct are those of the former Code of Professional Responsibility.

Former SCR 20.24 provided:

**Refusing employment when the interests of the lawyer may impair his or her independent professional judgment.** (1) Except with the consent of the client after full disclosure, a lawyer may not accept employment if the exercise of his or her professional judgment on behalf of the client will be or reasonably may be affected by hs or her own financial, business, property or personal interests."

The corresponding provision of the current Rules of Professional Conduct for Attorneys is SCR 20:1.7.

[2] Former SCR 20.28 provided:

**Refusing to accept or continue employment if the interests of another client may impair the independent professional judgment of the lawyer.** (1) A lawyer shall decline proffered employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment . . ..

The corresponding current rule is SCR 20:1.7.

[3] Former SCR 20.04 provided:

**Misconduct.** A lawyer shall not:

. . .

(4) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation. The corresponding current rule is SCR 20:8.4(c).

and having his restaurant corporation client execute and deliver to his individual client a bill of sale warranting the restaurant equipment to be free of all encumbrances, when he knew the equipment was subject to prior valid security interests and without first assuring that all prior security interests were or would be released. Finally, the referee concluded that Attorney Charlton neglected to complete the sale-leaseback transaction for his individual client by failing to obtain the release of the prior security interests, in violation of SCR 20.32(3).[4]

(2) In 1979, when the restaurant corporations needed to raise additional capital and financing from banks and other commercial lenders was unavailable. Attorney Charlton contacted a close personal and business friend whom he had represented in severl legal matters and was representing in matters pending at the time. That client, Attorney Charlton and other restaurant investors decided to restructure and recapitalize the restaurant operation and sought a loan from a small business investment company. They formed and Attorney Charlton represented a company to hold the stock of the restaurant corporations. In negotiating the $350,000 loan, Attorney Charlton represented the holding company and the individual client, who guaranteed and provided collateral for the loan, for which he received a one-quarter share in the holding company. Attorney Charlton also acted as legal counsel for all of the restaurant corporations, for one of the restaurant corporation investors and his wife and for himself.

---

[4] Former SCR 20.32 provided:

**Failing to act competently.** A lawyer may not:

. . .

(3) Neglect a legal matter entrusted to the lawyer.

The corresponding current rule is SCR 20:1.3.

Neither prior to nor at the closing did Attorney Charlton make full disclosure of the financial condition of the restaurant corporations to his individual client or to the lender and he intentionally misrepresented the restaurants' financial condition to induce them to enter into the loan agreement. He also failed to advise them that stock of at least two of the restaurant corporations was already pledged to and held by banks as collateral for loans and that substantial assets of the corporations were encumbered and pledged. In addition, he failed to disclose to the individual client the extent of his personal involvement in the restaurant chain, including his several personal guarantees of restaurant debt, failed to advise him of the possible effects of his multiple representation of parties in the loan transaction and the potential conflicts of interest inherent therein and failed to advise the lender of the ownership interest of one of the investors in the restaurant chain.

Immediately after the closing, Attorney Charlton and his individual client took the loan proceeds to a bank to open an account for the holding company, whereupon the individual client learned the bank was holding substantial overdrafts on the accounts of several of the restaurants. He then told Attorney Charlton he wanted to return the proceeds to the lender and rescind the loan but Attorney Charlton advised him that if he did so, he and the other investors would be exposed to potential civil and criminal liability. The referee found that when he gave that advice, Attorney Charlton was representing not only the individual investor but also the restaurant corporations of which he was officer, director and shareholder.

Later the same day, the individual client learned of restaurant overdrafts exceeding $150,000, that the restaurant corporations were more than $200,000 delin-

quent in federal and state withholding, social security, unemployment compensation and sales taxes and that many other debts and loans of the restaurant corporations were delinquent or in default. He further learned that persons managing the corporations had engaged in a check kiting scheme and had written checks on corporate accounts in which there were no funds to pay them. Based on these discoveries, the individual client realized that the holding company had breached representations and warranties it had made earlier that day in the loan agreement it entered into with the investment company.

Although Attorney Charlton knew the restaurant corporations had made false representations and warranties in that loan agreement, in October, 1979, he reexecuted a corrected form of the loan agreement and issued opinion letters as legal counsel for the restaurant corporations stating that, to the best of his knowledge and belief, the representations and warranties in that agreement were true and correct. The referee noted that while the loan agreement provided that the total indebtedness of the holding company was not to exceed $600,000, the indebtedness actually exceeded $2,000,000 and that Attorney Charlton knew of the serious financial condition of the restaurants in time to rescind the loan transaction but did not do so, thus failing to protect his individual client's interests and deceiving the lender.

The referee concluded that Attorney Charlton knowingly made misrepresentations, in violation of SCR 20.04(4), concerning the holding company's financial condition and the condition of the restaurants in order to induce the investment company to lend money and to induce his individual client to guarantee and provide collateral for the loan. Further, he violated SCR 20.28(1) when he represented the individual client, the restaurant corporations, one of the investors and his wife and him-

self and failed to disclose to the individual client the possibility of a conflict in those multiple representations. Also, he violated SCR 20.24(1) by representing the individual client in a transaction where the exercise of his professional judgment on that client's behalf was or reasonably might have been affected by his own interests in the transaction, without full disclosure to and informed consent of his client.

(3) In November, 1979, Attorney Charlton urged the individual client who had participated in the holding company loan to purchase the interest of the bank in the loan it had made to the restaurant in 1976 in order to protect his interest as an investor in the holding company and obtain that bank's first secured position in respect to the restaurant equipment. In order to purchase that interest, the individual client borrowed money through a corporation he owned and controlled, thereby violating the holding company's loan agreement with the investment company.

Although the referee found that the evidence of an attorney-client relationship in this matter was not clear and convincing, he concluded that Attorney Charlton engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of SCR 20.04(4), by knowingly violating the terms of the holding company's loan agreement for his own personal gain.

(4) In 1980, while Attorney Charlton continued to act as officer, director and shareholder of the small business investment company that had loaned money to the restaurant in 1976, his law firm commenced a foreclosure action against the restaurant on the company's security interest in its equipment. Attorney Charlton named in that action the individual client's corporation that had purchased the bank's interest in its 1976 loan, together with its security interest in the same equipment, but he

did not name the individual client whom Attorney Charlton had represented in the June, 1979 sale-lease-back transaction purporting to convey the restaurant equipment free and clear of encumbrances. At the time he filed that foreclosure action, Attorney Charlton also acted as counsel for his individual client's corporation in two actions pending in federal court and formerly had served as officer and director of that corporation. In addition, his law firm represented the small business investment company in an action seeking a money judgment against the restaurant and against the persons who had guaranteed its debt in the 1976 loan.

The referee concluded that, because of his personal interests in the matter and the conflicting interests of the parties he represented, Attorney Charlton violated SCR 20.24(1) and 20.28(1). The referee also concluded that Attorney Charlton's failure to name the individual client in the sale-leaseback transaction as a party to the foreclosure action, who Attorney Charlton knew claimed an interest in the restaurant equipment, constituted conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of SCR 20.04(4).

(5) In 1973, two persons whom Attorney Charlton previously had assisted in obtaining limited partners for a business venture asked him to find limited partners for a new project to purchase real estate for rehabilitation. Attorney Charlton did so but when the financing portion of the project was ready to close, limited partner funds were insufficient. To provide the needed funds, a private investment and loan company in which Attorney Charlton and his wife were shareholders and which he regularly represented contributed $67,000 to the project. Although the two general partners were aware that Attorney Charlton had some involvement in the company, no disclosure of that involvement was made to the

859

limited partners or to the attorney who represented a number of them.

As a result of problems in obtaining financing, the limited partnership never acquired good title to the real estate. Further, a substantial portion of the $500,000 limited partnership funds could not be accounted for. The general partners then hired Attorney Charlton to pursue legal remedies against those believed responsible for the disappearance or misappropriation of those funds and Attorney Charlton filed an action on behalf of the project.

During this time, the attorney who represented a number of the limited partners sought the replacement of the two general partners, as a result of which Attorney Charlton became the sole general partners. While serving as attorney for the limited partnership and as its general partner. Attorney Charlton failed to disclose to the limited partners or to their attorney the extent of his involvement in the investment company that had participated in the project.

Attorney Charlton ultimately retained co-counsel in the pending litigation, with whom he entered into a fee agreement by the terms of which he was to receive one-third of the contingent fees. When the action settled in respect to one of the parties in 1980, approximately $50,000 of the settlement proceeds was given to Attorney Charlton as the project's general partner. Although he previously had agreed with co-counsel and the limited partners' attorney that settlement funds would be placed in his trust account and disbursed pro rata to the limited partners, he gave $10,000 of the settlement proceeds to the investment company that had participated in the project, without notice to co-counsel, the limited partners' attorney or the limited partners themselves. At no time prior to that disbursement had he informed any of

them that the investment company had "loaned" rather than invested the $67,000, as he later claimed, nor did he disclose his personal interest in that company and that he regularly represented it.

When the limited partners' attorney questioned the $10,000 disbursement, Attorney Charlton told him the company was a creditor of the limited partnership, not an investor, as it had "loaned" the money, not invested it. The attorney objected to the payment, as he had had no knowledge of Attorney Charlton's involvement in the company and had been led to believe that the company was a limited partner investor in the project and, as such, was to share in any settlement pro rata with the other limited partners. He demanded that the company return the $10,000 payment and Attorney Charlton refused.

When the company made the $67,000 investment, it had borrowed the money to do so from a bank, giving as security Attorney Charlton's personal guaranty. By the time the settlement in the action was received, Attorney Charlton personally had repaid the bank and, consequently, was entitled to the money that had been disbursed to the investment company. That personal guaranty and his repayment of the loan were not disclosed to the limited partnership, the limited partners or their attorney.

The referee concluded that Attorney Charlton accepted employment and acted as attorney in this matter when the exercise of his professional judgment on behalf of his client might be affected by his own financial, business, property or personal interests or by his representation of others in the same transaction, in violation of SCR 20.24(1) and 20.28(1).

(6) In 1979, a man with whom Attorney Charlton had participated in a number of business deals and

whom he then represented in legal proceedings, sold his and his wife's interest in a nursing home to Attorney Charlton, who owned an equal share in the business. Attorney Charlton gave the man an unsecured promissory note for $75,000 but when he asked for an assignment of the original stock certificate, the man told Attorney Charlton he would sign the stock certificate over to him when he was paid in full. Soon thereafter, the man wrote on the original stock certificate that he would transfer it to Attorney Charlton upon payment of the note in full.

In June, 1979, when the first installment on the note was due, Attorney Charlton told the man he would not be able to make the payment and asked to rescind the stock purchase. The man agreed and Attorney Charlton prepared and had the man sign a document rescinding the transaction. When the man asked Attorney Charlton for a copy of the document, he was told he did not need one because he continued to hold the original stock certificate.

Thereafter, Attorney Charlton purported to sell the man's stock in the nursing home, together with his own, to a third party, using a copy of the man's stock certificate to make the transfer, despite the fact that he knew the man retained possession of the original certificate, that he had never paid for the stock and that the original stock sale had been rescinded. The referee concluded that Attorney Charlton thereby engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of SCR 20.04(4).

(7) In 1969, Attorney Joseph Greco, who was employed in Attorney Charlton's law firm, was appointed successor trustee of a trust. Although he was not a partner in Attorney Charlton's law firm, he was held out to the public as a partner in various law firm

names, letterhead stationery and signs at the law firm. At the hearing at which Attorney Greco was appointed trustee, Attorney Charlton, identifying himself as of the law firm "Charlton, Yanisch, Gain, Dieterich & Greco," appeared on behalf of the trust's beneficiary. Initial inventory and accounts for the trust were then filed by "Charlton, Yanisch, Greco & Roffa."

While serving as trustee, Attorney Greco made loans of trust monies to his and Attorney Charlton's friends, clients and relatives. Attorney Charlton referred to him people who had sought small loans from his own investment companies. During the early years of the trust, Attorney Charlton prepared notes, mortgages and other documents relating to the loans being made by the trust and charged a percentage of the loan as a "loan fee" or "finder's fee," which the trust collected from the borrowers and paid to Attorney Charlton's firm.

Attorney Charlton testified that he was representing the trust in those loan transactions but that in preparing the documents for some of them, he was representing the borrowers. He also acknowledged representing some of the borrowers in drafting satisfactions of mortgages when loans were paid off. When several of the loans went into default, Attorney Charlton's firm sent out collection letters on behalf of the trust.

When the trust was terminated in March, 1980, an attorney from Attorney Charlton's law firm appeared on behalf of Attorney Greco and the beneficiary. Subsequently, the firm represented the beneficiary personally in efforts to collect on the loans that the trust had made, many of which proved uncollectible.

In his response to the Board in its investigation of this matter, Attorney Charlton contended that he and his law firm represented the trust for two years and performed no other legal services thereafter and that he

did not represent the beneficiary, the trustee or the trustt in any other loan transactions. In subsequent responses, he contended that his office was never responsible for collecting any of the loans and that his firm never represented the beneficiary or the trust, except at the very outset and at the very end of its existence. However, at the disciplinary hearing Attorney Charlton admitted that those responses were inaccurate, contending that they were made in good faith and based upon incomplete information.

The referee concluded that Attorney Charlton violated SCR 20.24(1) and 20.28(2)[5] by accepting employment when his independent professional judgment on behalf of the client was or reasonably might have been affected by his own personal interest or his representation of other parties in the transaction.

(8) In 1986 Attorney Charlton represented a company that was the defendant in an action in circuit court. Counsel for the plaintiff had previously been employed by Attorney Charlton and knew he had represented the defendant in the past and had considerable business involvement with him. Soon after the action was filed, Attorney Charlton withdrew and the defendant obtained other counsel in the action.

---

[5] Former SCR 20.28 provided:

**Refusing to accept or continue employment if the interests of another client may impair the independent professional judgment of the lawyer.**

. . .

(2) A lawyer may not continue multiple employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client . . ..

The corresponding current rule is SCR 20:1.7.

Thereafter, Attorney Charlton told the plaintiff's attorney that his client was responsible for a grievance pending against him with the Board of Attorneys Professional Responsibility and that if the client would write to the Board that he had no complaint against Attorney Charlton, Attorney Charlton would recommend to the client he had previously represented in the action that he pay a specified amount in settlement of the plaintiff's claim. In fact, there were grievances pending with the Board concerning Attorney Charlton's conduct in matters involving the plaintiff, but the plaintiff had not filed a grievance. On three subsequent occasions Attorney Charlton telephoned the plaintiff's attorney and repeated the offer he had made. Ultimately, he told him he no longer needed the letter from the client.

The referee concluded that Attorney Charlton's offer to settle the case on behalf of a client in exchange for a favorable letter to the Board from the opposing party constituted illegal conduct involving moral turpitude and conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of SCR 20.04(3)[6] and (4), a failure to seek his client's lawful objectives, in violation of SCR 20.35,[7] and engaging in professional employment

---

[6] Former SCR 20.04 provided:

**Misconduct.** A lawyer shall not:

. . .

 (3) Engage in illegal conduct involving moral turpitude.

The corresponding current rule is SCR 20:8.4(c).

[7] Former SCR 20.35 provided, in relevant part:

**Representing a client zealously.** (1) A lawyer may not intentionally:

 (a) Fail to seek the lawful objectives of the lawyer's client through reasonably available means permitted by law and the disciplinary rules . . ..

The corresponding current rule is SCR 20:1.2.

in which the exercise of his judgment on behalf of his client was affected by his own interests, in violation of SCR 20.24(1).

(9) For a period of years prior to February 1, 1980, Attorney Charlton practiced under the law firm name of "Charlton, Gronowski, Welcenbach and Stanich" and variations thereof. He used letterhead stationery and held bank accounts with those or similar names. In fact there was no such partnership; Attorney Charlton was a sole practitioner in various office sharing arrangements. Also at various times prior to 1980, Attorney Charlton misrepresented his law firm as a service corporation when in fact he was operating as a sole practitioner. The referee concluded that Attorney Charlton falsely implied a partnership with one or more lawyers when no such partnership existed, in violation of SCR 20.08(2) and (3),[8] and used a law firm name misrepresenting the firm as a service corporation and thus practiced in a misleading manner, in violation of SCR 20.08(2).

---

[8] Former SCR 20.08 provided:

**Professional notices, letterheads, offices and law lists.**

. . .

(2) A lawyer in private practice may not practice under a trade name, a name that is misleading as to the identity of the lawyer or lawyers practicing under the name, or a firm name containing names other than those of one or more of the lawyers in the firm, except that the name of a professional corporation or professional association may contain the word "Chartered," or "Limited," or the abbreviation "Ltd.," or the words "Service Corporation," or the abbreviation "S.C." or similar symbols indicating the nature of the organization and if otherwise lawful a firm may use as, or continue to include in, its name the name or names of one or more deceased or retired members of the firm or of a predecessor firm in a continuing line of succession . . .

(3) A lawyer may not represent that he or she has a partnership with one or more lawyers unless they are in fact partners.

The corresponding current rule is SCR 20:7.5.

(10) Between August 1, 1978 and July 31, 1984, Attorney Charlton failed to maintain complete trust account records of all funds he held for clients. The referee noted that Attorney Charlton and others testified that the basement of his office building was flooded in 1985 and his trust account records were probably destroyed. The referee emphasized, however, that when the Board had asked him to produce trust account records in August, 1984, he failed to do so and in his written response to the Board on October 19, 1984 made no mention of flooding in the basement of his building. The referee concluded that Attorney Charlton's failure to maintain complete records of all funds held in trust for clients violated SCR 11.05(2)[9] and SCR 20.50(2)(c).[10]

---

[9] Former SCR 11.05 provided:

**Trust accounts required.**

. . .

(2) A member of the state bar shall maintain and preserve for at least 6 years complete records pertaining to client's funds or assets received by him or her which are required to be distributed or segregated by sub. (1). The records shall include his or her trust fund checkbooks and the stubs thereof, statements of the account, vouchers and canceled checks or share drafts thereon or microfilm copies thereof and his or her account books showing dates, amounts and ownership of all deposits to and withdrawals by check or share draft or otherwise from the accounts, and all of the records shall be deemed to have public aspects as related to the member's fitness to practice law. Upon request of the board of attorneys professional responsibility, or upon direction of the supreme court, the records shall be submitted to the board for its inspection, audit, use and evidence under such conditions to protect the privilege of clients as the court may provide. The records, or an audit thereof, shall be produced at any disciplinary proceeding involving the attorney wherever material. Failure to produce the records shall constitute unprofessional conduct and grounds for disciplinary action.

The corresponding current rule is SCR 20:1.15(f).

[10] Former SCR 20.50 provided:

867

(11) During the course of this disciplinary proceeding, Attorney Charlton gave false information to the Board concerning legal representation he rendered in relation to the trust, as set forth in (7), above. The referee concluded that Attorney Charlton thus knowingly failed to cooperate with the Board, in violation of SCR 21.03(4)[11] and 22.07(2) and (3).[12]

**Preserving identity of funds and property of a client.**

. . .

(2) A lawyer shall:

. . .

(c) Maintain complete records of all funds, securities and other properties of a client coming into the possession of the lawyer and render appropriate accounts to the client regarding them.

The corresponding current rule is SCR 20:1.15(b).

[11] SCR 21.03 provides:

**General principles.**

. . .

(4) Every attorney shall cooperate with the board and the administrator in the investigation, prosecution and disposition of grievances and complaints filed with or by the board of administrator.

[12] SCR 22.07 provides:

**Investigation.**

. . .

(2) During the course of an investigation, the administrator or a committee may notify the respondent of the subject being investigated. The respondent shall fully and fairly disclose all facts and circumstances pertaining to the alleged misconduct or medical incapacity within 20 days of being served by ordinary mail a request for response to a grievance. The administrator in his or her discretion may allow additional time to respond. Failure to provide information or misrepresentation in a disclosure is misconduct. The administrator or committee may make a further investigation before making a recommendation to the board.

(3) The administrator or committee may compel the respondent to answer questions, furnish documents and present any information deemed relevant to the investigation. Failure of the respondent to answer questions, furnish documents or present relevant

In his appeal from the referee's report, Attorney Charlton first asserted that the doctrine of laches bars this proceeding and that his constitutional rights to prior notice of charges, an opportunity to prepare a defense and a full hearing without unreasonable delay were violated. He based those defenses on the fact that most of his conduct considered in this proceeding occurred so long before the matter was investigated and ultimately prosecuted by the Board that he was unable to obtain and present evidence necessary to a proper determination of the issues.

The referee properly rejected the laches defense in the course of this proceeding, determining that the delay in the investigation and prosecution was not unreasonable and that Attorney Charlton failed to establish that it prejudiced his defense against the misconduct allegations. The referee noted that while many of the incidents of alleged misconduct occurred in the mid–1970's, the first of several grievances filed against Attorney Charlton did not reach the Board until November, 1981 and the last of them in 1988, after the Board's initial complaint in this proceeding was filed on June 5, 1987. Further, the referee determined that, although there was admitted delay in the Board's investigation of the grievances, it was not established that the delay was unreasonable in light of the complexity of the factual settings in which the alleged misconduct occurred.

In respect to his claim that several persons who died before the disciplinary hearing was held would have testified favorably to him, the referee considered Attorney Charlton's testimony concerning what those persons

information is misconduct. The administrator or a committee may compel any other person to produce pertinent books, papers and documents under SCR 22.22.

might have offered and concluded that their absence did not deprive Attorney Charlton of a meaningful defense. Moreover, while the lapse of time between the acts of misconduct and the disciplinary hearing resulted in the inability of some witnesses to recall with specificity the facts on which some of the misconduct allegations were based, the referee properly determined it did not preclude the Board from establishing Attorney Charlton's professional misconduct by clear and satisfactory evidence.

Even if laches were applicable here, it would not constitute a defense to this disciplinary proceeding. In *Disciplinary Proceedings Against Eisenberg,* 144 Wis. 2d 284, 423 N.W.2d 867 (1988), we rejected the argument that laches barred a disciplinary proceeding based on statements the attorney made eight years prior to the commencement of that proceeding.

> . . . [W]e are not persuaded that the doctrine of laches does or should bar a proceeding the issue of which is an attorney's fitness to practice law as demonstrated by his professional conduct. However, a substantial lapse of time between professional misconduct and the initiation of disciplinary proceedings based thereon is a factor to be considered in the determination of appropriate discipline to be imposed, as it may affect the ends lawyer discipline is to achieve: protection of the public, the courts and the legal profession, rehabilitation of the attorney and deterrence of like misconduct by others.

*Id.* at 294.

Here, the passage of time from Attorney Charlton's misconduct and the disciplinary hearing does not mitigate the seriousness of that misconduct nor does it diminish the need to protect the public from his continu-

ing to engage in similar misconduct. The referee based his recommendation for a license revocation as much on Attorney Charlton's current attitude toward his misconduct as on the seriousness of that misconduct when it occurred:

> "Attorney Charlton has shown a consistent and persistent lack of sensitivity to obvious conflicts of interest."
> "The most disturbing thing to this referee is the fact that Charlton still seems unable to recognize the conflicts of interest in which he was involved."
> "He was and is defiant in seeking to justify his conduct . . . ."
> "He took advantage of his business and personal relationships with his clients . . . to help protect his financial investments and loan guarantees in the restaurants. He failed then to recognize the obvious, indeed glaring, conflicts of interest, and still does."
> "The sad fact is that because he still insists he did nothing wrong, there is no reason to think he would not make the same mistakes again."

In addition to the assertion of laches as a defense, we reject Attorney Charlton's claim of violation of his constitutional rights by the length of time between the occurrence of his conduct and the investigation and prosecution of it. Similar constitutional grounds were argued and rejected in *Disciplinary Proceedings Against Eisenberg*, 117 Wis. 2d 332, 344 N.W.2d 169 (1984). There, as here, the attorney failed to establish prejudice as a result of the delay in commencing the disciplinary proceeding.

Attorney Charlton next contended that the referee failed to weigh the credibility of the witnesses who testi-

fied at the disciplinary hearing. That contention is meritless, as on more than one occasion, the referee explicitly found Attorney Charlton's version of events not credible. Furthermore, even when not explicitly addressing the credibility of the witnesses, the referee implicitly weighed the credibility of the witnesses when he made findings consistent with testimony that was directly contrary to that presented by Attorney Charlton and persons testifying in his favor. It is not necessary that the referee make a specific finding as to the credibility of each witness on whose testimony he relies in making findings of fact, as Attorney Charlton contended.

In his next argument, Attorney Charlton contended that many of the referee's findings of fact are clearly erroneous and most of his conclusions of law are unsupported by factual findings sufficient to sustain them. Attorney Charlton's principal contention in this regard is that the referee did not make a specific finding of fact as to each "element" of the applicable rule of attorney conduct. For example, Attorney Charlton took the position that whenever the referee concluded he had violated SCR 20.24(1), he was first required to make a finding that Attorney Charlton had "accepted employment" on behalf of a client. Similarly, he argued that the conclusions were improper absent a specific finding that his independent professional judgment in behalf of a client would be or was likely to be adversely affected by his employment by another client, as set forth in SCR 20.28(1). Attorney Charlton asked that this proceeding be remanded to the referee for the making of what he considers necessary findings for each conclusion as to which the referee made no specific factual finding directly addressing each provision of the rule of conduct deemed to have been violated.

In respect to the conclusion that prior to 1980 he practiced law under misleading firm names, Attorney Charlton argued that the referee improperly relied on a published Comment to the rule adopted in 1988, SCR 20:7.5, which corresponds to the rule he was deemed to have violated, SCR 20.28. The referee's citation of the 1988 Comment was unnecessary to his conclusion that Attorney Charlton violated the former rule. Attorney Charlton's contention that under the former rule the referee had to have found he intended to mislead has no merit. *See, Disciplinary Proceedings Against Laubenheimer,* 113 Wis. 2d 680, 335 N.W.2d 624 (1983).

Attorney Charlton also attacked several of the referee's conclusions by positing contrary conclusions from the facts. For example, he speculated on the reasonableness of the conduct of his clients in the business transactions, suggesting that their actions and testimony indicated they knew far more about the business deals than they were willing to admit. He also suggested that his clients' knowledge of his involvement in the business deals demonstrated that there had been some disclosure of his interests in the transactions. Those "insufficient evidence" arguments are nothing more than contentions that the referee rejected testimony favorable to him and accepted other testimony Attorney Charlton considered unreliable.

Attorney Charlton's argument that a referee is required to make a specific finding of fact in respect to each element of a rule of professional conduct he concludes an attorney has violated is without merit. A specific factual finding that Attorney Charlton "accepted employment" on behalf of a client is not required to support a conclusion that he acted in the presence of a conflict of interest, provided the facts establish that he

represented the client in the matter at issue. Likewise, a referee is not required to make a specific finding on precisely how an attorney's financial interest in a matter does or might adversely affect that attorney's representation of a client when the potential or actual adverse effect is apparent from the attorney's interest in the matter itself. Where the referee has made sufficient factual findings to warrant conclusions that attorney conduct rules have been violated, the absence of specific findings addressing each provision of the relevant rule does not render those conclusions defective so as to require remand to the referee for further findings of fact.

We are satisfied from this record that the referee's findings of fact are not clearly erroneous and we adopt those findings. We also adopt the referee's conclusions that Attorney Charlton's conduct violated the applicable rules of professional conduct, with the exception of the conclusion that his having urged a person to take an assignment of a bank's interest in a loan transaction, in violation of the terms of a subsequent loan, constituted conduct involving dishonesty, fraud, deceit or misrepresentation. The facts found by the referee in respect to that matter, set forth at (3) above, do not support the conclusion that Attorney Charlton thereby violated SCR 20.04(4).

In addition to recommending license revocation as discipline for Attorney Charlton's misconduct, the referee recommended that he be required to pay the costs of this proceeding, with the exception of the costs attributable to the disciplinary hearing held before the referee whose death necessitated a subsequent hearing. Opposing that recommendation, Attorney Charlton took the position that he should not be assessed the costs incurred in the Board's prosecution of the two counts of

alleged misconduct the referee recommended be dismissed or in any of the remaining counts as to which the court might reject the referee's conclusion that he engaged in professional misconduct. Attorney Charlton filed a general objection to the Board's statement of costs filed in this proceeding but made no specific objection to any particular item of cost. Following the Board's supplemental statement of costs filed upon completion of the briefing in his appeal, Attorney Charlton made specific objection to portions of Board counsel fees and disbursements for work on the Board's brief, claiming they were "unreasonable and excessive," and charges for work performed by paralegal personnel for organization, record and assembly of the Board's brief.

Consistent with our prior holdings, we reject Attorney Charlton's contention that he should be assessed only those costs related to the misconduct allegations set forth in the Board's complaint in respect to which he is held to have engaged in professional misconduct. We agree with the referee that Attorney Charlton should not be charged with the costs incurred in the first disciplinary hearing held in this proceeding and note that in its reply to Attorney Charlton's objection to the initial statement of costs, the Board asserted that the costs set forth did not include those incurred from the commencement of the first disciplinary hearing to the appointment of Attorney Anderson as referee. We reject Attorney Charlton's specific objections to the costs incurred by the Board in filing its responsive brief in his appeal.

In determining discipline to be imposed for Attorney Charlton's misconduct, we consider first the seriousness of that misconduct. Here, the misconduct included the representation of parties in matters in which Attor-

ney Charlton had conflicting interests, misrepresentations to parties in business deals in which he was professionally and personally involved, attempts to interfere with the grievance procedure by offering a settlement of a civil action against his client, failure to perfect a client's security interest, misstatements to the Board concerning his involvement in the activities of a trust, failure to keep complete trust account records and practicing law under the name of a firm suggesting a partnership or service corporation when there was none. The nature and extent of that misconduct alone warrant serious discipline.

We next consider the discipline needed to protect the public, the courts and the legal system from Attorney Charlton's repetition of misconduct, to impress upon him the seriousness of it and to deter other attorneys from engaging in similar misconduct. The record amply demonstrates Attorney Charlton's inability or refusal to recognize his misconduct and accept responsibility for it. Coupled with the seriousness of the misconduct, Attorney Charlton's failure to acknowledge and accept his professional responsibility in these matters warrants the revocation of his license to practice law.

Finally, we note that after the referee had filed his report, letters were submitted to the court from various sources in support of Attorney Charlton and opposed to the recommended license revocation. A letter was also received from a former client of Attorney Charlton seeking restitution for financial loss allegedly incurred as a result of his misconduct. Those communications were not before the referee in this disciplinary proceeding and we do not consider them in this appeal.

IT IS ORDERED that the license of Earl A. Charlton to practice law in Wisconsin is revoked, effective June 1, 1993.

IT IS FURTHER ORDERED that within one year of the date of this order Earl A. Charlton pay to the Board of Attorneys Professional Responsibility the costs of this disciplinary proceeding as set forth in the statement of costs filed in this proceeding.

IT IS FURTHER ORDERED that Earl A. Charlton comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been revoked.

CECI, J., took no part.