IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Michael G. TREWIN, Attorney at Law:

OFFICE OF LAWYER REGULATION, Complainant-
Respondent,

v.

Michael G. TREWIN, Respondent-Appellant.

Supreme Court

*No. 02–3314–D. Oral argument April 29, 2004.—Decided
July 27, 2004.*

2004 WI 116

(Also reported in 684 N.W.2d 121.)

For the respondent-appellant there were briefs by *Mark J. Steichen* and *Boardman, Suhr, Curry & Field LLP*, Madison, and oral argument by *Mark J. Steichen.*

For the complainant-respondent there was a brief and oral argument by *Julie M. Falk*, Madison.

¶ 1. PER CURIAM. Attorney Michael G. Trewin has appealed from a referee's report concluding that he engaged in professional misconduct and recommending that his license to practice law in Wisconsin be suspended for a period of five months.

¶ 2. We conclude that the referee's findings of fact are supported by satisfactory and convincing evidence. We further determine that the seriousness of Attorney Trewin's misconduct warrants the suspension of his

license to practice law for a period of five months. We also agree with the referee that all costs of the proceeding should be assessed against Attorney Trewin.

¶ 3. Attorney Trewin was admitted to practice law in Wisconsin in 1985 and practices in New London. He has not previously been the subject of a disciplinary action. He focuses his practice on bankruptcy and debt reorganization and specializes in farm bankruptcies. He is also the sole owner of a corporation called Midwest Comics, Inc.

¶ 4. In December 2002 the Office of Lawyer Regulation (OLR) filed a complaint alleging that Attorney Trewin engaged in professional misconduct with respect to his representation of a number of clients in bankruptcy or debt reorganization proceedings. Konrad T. Tuchscherer was appointed referee. In September 2003 the referee granted partial summary judgment in favor of Attorney Trewin, dismissing portions of the misconduct counts alleged by the OLR. A two-day hearing was held before the referee in November 2003 on the remaining counts. The referee's report and recommendation was issued on December 16, 2003.

¶ 5. The majority of the counts of misconduct alleged by the OLR involve Attorney Trewin's representation of D.S., a farmer who retained Attorney Trewin in December 1997 to represent him concerning financial difficulties, including the possible repossession of his farm equipment and a possible farm foreclosure. In January 1998 Attorney Trewin filed a "quick-file" Chapter 12 bankruptcy action on behalf of D.S. to forestall the repossession of the farm equipment and to permit D.S. to reorganize. In April 1998 Attorney Trewin filed a reorganization plan for D.S. Soon thereafter Attorney Trewin began negotiating with D.S.'s creditors, which included John Deere and Associated Bank North. At-

torney Trewin negotiated settlements with two judgment creditors which required D.S. to pay $12,500 to satisfy the judgments.

¶ 6. In the months following the filing of the reorganization plan, D.S. was unable to meet the payments required, and the bankruptcy was converted into a Chapter 7 proceeding which allowed D.S. to discharge his unsecured debts and attempt to renegotiate his secured debt with his secured creditors. D.S. did not have the money to pay the $400 fee to convert the bankruptcy from a Chapter 12 to a Chapter 7, nor did he have the funds to pay off the judgment creditors. Attorney Trewin recommended that D.S. try to borrow the money from family, friends, or financial institutions. When D.S. was unable to do so Attorney Trewin agreed to lend D.S. $12,900, $400 to convert the bankruptcy to a Chapter 7 and $12,500 to pay off the two judgments. Attorney Trewin did not request or obtain any security for the loan. The loan itself was made through Midwest Comics, Inc. Attorney Trewin admitted he did not advise D.S. about the possible adverse results of an attorney loaning money to a client, nor did D.S. sign a written conflict waiver prior to signing the $12,900 promissory note to Midwest Comics. Attorney Trewin also did not obtain written consent from D.S. to continue to represent him in the bankruptcy action, or in continued negotiations with creditors after he became D.S.'s creditor himself. Attorney Trewin said he did tell D.S. to seek independent counsel and said he explained to D.S. the potential for conflicts of interest to arise in the event of defaults on loans or contracts and the consequences that Attorney Trewin would be unable to represent D.S. in the event of such a conflict.

¶ 7. On or about September 21, 1998, D.S. returned the signed promissory note to Attorney Trewin

along with the first month's payment on the loan. Attorney Trewin had disbursed the $400 fee to convert the bankruptcy action to a Chapter 7 in August 1998 but did not disburse the funds to pay off the two judgments until he received the signed promissory note from D.S. The September 21, 1998, payment and all subsequent payments made by D.S. were deposited into either Attorney Trewin's personal or law office account.

¶ 8. While D.S.'s bankruptcy action was still pending, Attorney Trewin submitted a proposal to Associated Bank whereby D.S. would reaffirm his debt to Associated Bank in lieu of Associated Bank exercising its right to foreclose on D.S.'s property secured by various mortgages and security agreements. D.S. received a discharge in bankruptcy on December 3, 1998. Discussions continued between Associated Bank and Attorney Trewin regarding reaffirmation of the Associated Bank's secured debt so D.S. could stay in business on the farm. Associated Bank's attorney sent Attorney Trewin a proposal in early January 1999 containing a number of conditions, including requiring D.S. to bring the interest on his loan current and keep his payments current throughout the term of the agreement. D.S. did not have the means to meet the conditions set by Associated Bank.

¶ 9. In February 1999 Attorney Trewin sent D.S. a bill for legal services rendered since December 1997. The bill totaled $7899.58. Among the disbursements itemized was $400 to convert the bankruptcy to a Chapter 7. Neither D.S. nor Attorney Trewin noticed that this sum was already reflected in the $12,900 promissory note. After the inception of the OLR's investigation, Attorney Trewin corrected the $400 overcharge on a revised loan accounting.

¶ 10. While negotiations with Associated Bank continued, D.S. discussed with Attorney Trewin the need for more dairy cows to increase the farm's cash flow. D.S. also discussed this matter with his son, K.S. Although D.S. was not well and was suffering from cancer at the time, K.S. agreed that purchasing additional cattle was a good way to increase cash flow. When D.S. was unable to obtain financing to buy cattle from other sources, Attorney Trewin agreed to lend him money through Midwest Comics, Inc., at 12 percent interest. Attorney Trewin prepared two promissory notes, a security agreement, a UCC financing statement, a mortgage on the farm, and an assignment of dairy income and sent them to D.S. Attorney Trewin said although he advised D.S. orally that he should consult another attorney for advice on the transaction, he did not obtain a separate written conflict waiver from D.S.

¶ 11. D.S. signed two promissory notes on May 17, 1999. The first, in the amount of $130,000, reflected disbursements for additional cattle, points and document preparation fees and the payment of Attorney Trewin's legal fees from the February 1999 bill. The second note, in the amount of $29,326.52, represented an operating loan. D.S. acquired additional dairy cows with the loan proceeds. The second promissory note was labeled a "line of credit." As part of the line of credit Attorney Trewin provided several of his credit card numbers to Harmony Co-op in Colby, Wisconsin, and allowed D.S. to purchase feed and other supplies on Attorney Trewin's credit. Attorney Trewin then made direct payments to the Co-op on D.S.'s behalf.

¶ 12. Charges incurred on behalf of D.S. were added to a loan spreadsheet by Attorney Trewin. Attorney Trewin charged D.S. interest on the date D.S. made

purchases at the Co-op rather than the due date on Attorney Trewin's credit card bill. Attorney Trewin did not obtain D.S.'s written consent as to when interest would begin to accrue on the charges D.S. made at the Co-op. Attorney Trewin's accounting to D.S. as to the balances owed and charges made contained a number of errors. After the OLR initiated its investigation Attorney Trewin acknowledged the errors and made corrections.

¶ 13. There was no public record of Attorney Trewin's security interest in Midwest Comics at the time of the May 1999 loans to D.S. because Midwest Comics had been administratively dissolved in June 1996 as the result of a failure to file an annual report with the Wisconsin Department of Financial Institutions. Attorney Trewin did not file and record the financing statement which evidenced Midwest Comic's interest in the cattle or the mortgage on D.S.'s real estate.

¶ 14. In May 1999 Associated Bank's attorney sent Attorney Trewin a proposed workout agreement providing that its loan would be due in full on April 20, 2000. Associated Bank's attorney requested that Attorney Trewin provide information on the purchase money financing of D.S.'s new dairy cows so that Associated Bank could distinguish the cows in which it had an interest from the later acquired cows. Attorney Trewin initially did not tell the bank that he was behind the purchase money financing for the new cows. D.S. never returned the loan workout agreement and in July 1999 Associated Bank commenced a foreclosure action against D.S. in Wood county.

¶ 15. At the time the foreclosure action was commenced, Midwest Comics, Inc. was not named a defendant since it had not filed or recorded evidence of the

loans to D.S. Attorney Trewin understood that Associated Bank's security interests were higher in priority than those of Midwest Comics. After the foreclosure action was filed, Attorney Trewin assigned Midwest Comics' promissory notes and security interest to his brother-in-law, Daniel Schommer. Under the terms of the assignment Schommer had no real ownership interest and all interest earnings reverted to Midwest Comics. As expressed in a memo to Schommer, Attorney Trewin's interest in entering into the assignment was to avoid any possibility that he might be called to testify in the foreclosure action and therefore be prevented from representing D.S. under the rules of professional conduct dealing with lawyers as witnesses. At the conclusion of the foreclosure action the loan was reassigned by Schommer to Midwest Comics.

¶ 16. When Associated Bank discussed possible settlement with Attorney Trewin, Attorney Trewin informed the bank that Schommer held the purchase money interest in the cattle. Attorney Trewin did not tell the bank he was a shareholder of Midwest Comics or that he had a security interest in D.S.'s real estate and personal property, including the cattle. Attorney Trewin proposed that D.S. stipulate to a default judgment with the redemption period for the recovery of the animals and farm equipment being tied to the 12–month redemption period for the real estate. That proposal allowed D.S. to maintain an income from the farm during the redemption period.

¶ 17. On October 19, 1999, D.S. wrote Attorney Trewin a $5000 check payable to the Michael G. Trewin Trust Account. The money was earmarked for payment to John Deere. Although the check was made payable to the trust account and constituted funds belonging to D.S., it was deposited into Attorney Trewin's business

checking account. Attorney Trewin made a payment to John Deere on D.S.'s behalf on December 31, 1999, and credited D.S. with the $5000 payment.

¶ 18. On October 29, 1999, Attorney Trewin sent a letter to Associated Bank's attorney with a list of the new cattle purchased by D.S. The letter identified Midwest Comics as the lender. Attorney Trewin signed Schommer's name on the stipulation identifying the purchase money cows. This information was incorporated into a default judgment entered by the court providing that Associated Bank would forego the recovery of its collateral until November 1, 2000, subject to a number of conditions, including that D.S. remain current on his payments. As an inducement to get Associated Bank to agree to the terms of the default judgment, Attorney Trewin permitted Associated Bank to take a security interest in the new cows ahead of Midwest Comics' purchase money security interest.

¶ 19. In November 1999 D.S. asked Attorney Trewin to reduce the amount of his milk assignment for that month by $1150 to allow him to cure a default to Associated Bank. Attorney Trewin agreed and D.S. asked to pick up a check from Attorney Trewin in that amount payable to Associated Bank on November 22, 1999. Attorney Trewin entered the transaction on a loan spreadsheet and charged interest as of that date but D.S. did not pick up the check. Attorney Trewin delivered the check to Associated Bank on December 2, 1999. D.S. defaulted on his loan payments to Associated Bank a number of times in the summer of 2000 and Attorney Trewin forwarded checks and an insurance binder to Associated Bank to cure the defaults.

¶ 20. In May 2000 D.S. requested a new line of credit from Attorney Trewin to plant crops. Attorney Trewin informed D.S. that any new loans would require

a refinancing of the old notes and that the interest rate would be 14 percent, with the payment amount remaining the same. On May 17, 2000, Midwest Comics loaned D.S. $9800 to pay John Deere, less a $2900 payment from D.S. Attorney Trewin did not obtain a signed written consent from D.S. prior to increasing the interest rate and adding $6900 to D.S.'s indebtedness. According to a loan spreadsheet, on May 17, 2000, Attorney Trewin added $11,521.88 to D.S.'s indebtedness to Midwest Comics and immediately began charging D.S. 14 percent interest on that amount although no funds were disbursed by Attorney Trewin on D.S.'s behalf on or before May 17.

¶ 21. In June 2000 D.S. entered into a new promissory note with Midwest Comics in the amount of $164,636.35 at 14 percent interest and also entered into a new dairy assignment. The note was also secured by the security agreement and mortgage entered into in May 1999. The new loan incorporated all existing indebtedness under the earlier note and the $11,521.88 that still had not been disbursed. Attorney Trewin did not obtain a written conflict waiver from D.S. regarding the June 2000 promissory note. D.S. continued charging purchases on Attorney Trewin's credit card which exceeded the $11,521.88. Attorney Trewin prepared a revised loan spreadsheet showing the excess charges. Although Attorney Trewin knew the dates D.S. had incurred the extra charges and the dates Trewin had paid the credit card bills, D.S. was charged 14 percent interest on the amount of $15,244.38 beginning May 17, 2000. As part of the OLR investigation Attorney Trewin corrected the actual disbursement dates on a revised loan accounting to reflect the dates Attorney Trewin had actually paid the credit card bills.

¶ 22. In late 2000 D.S. was falling more in debt and it was obvious he could not secure financing to pay off Associated Bank. Attorney Trewin devised a proposal whereby he would borrow money from F&M Bank of Antigo and lend that money to D.S. to pay off Associated Bank. Attorney Trewin said he recommended that D.S. consult independent counsel and reminded him there was a potential for a conflict of interest to arise if D.S. defaulted on the loan. On October 6, 2000, Attorney Trewin prepared a promissory note for $482,651.59, incorporating the prior D.S. indebtedness plus the additional loan to pay off Associated Bank and other creditors as well as points and fees for the transaction. Attorney Trewin also prepared a mortgage and UCC financing statement. D.S. signed the loan and security documents. Attorney Trewin did not ask D.S. to sign a separate written conflict waiver.

¶ 23. At the same time Attorney Trewin loaned the additional money to D.S., Attorney Trewin borrowed $325,000 from F&M Bank and assigned his interest in D.S.'s loan to F&M as collateral. Prior to entering into the transaction, D.S. requested that $7840 be paid to John Deere. Attorney Trewin prepared a closing statement showing such a payment to John Deere, but the payment was not made.

¶ 24. D.S. died on December 25, 2000. D.S.'s estate made payments on the loan to Attorney Trewin until April 2001. In October 2001 the estate filed an action against Attorney Trewin and Midwest Comics alleging a number of counts, including allegations of malpractice predicated on alleged violations of the rules of professional responsibility.

¶ 25. On October 5, 2001, F&M Bank filed a foreclosure action against Attorney Trewin and D.S. arising out of the estate's default on the loan to Attor-

ney Trewin. The estate's lawsuit against Attorney Trewin and the foreclosure action were consolidated. In November 2002 the circuit court granted Attorney Trewin's motion for summary judgment and dismissed the estate's claims against Attorney Trewin and ordered judgment in his favor for principal and interest in the amount set forth in his accounting. The court also declared that Attorney Trewin was entitled to a judgment of foreclosure. The estate appealed and the court of appeals affirmed. Most of the property owned by D.S. has been sold and Attorney Trewin has been paid part of his judgment.

¶ 26. Attorney Trewin was delinquent in filing both Midwest Comics' 1999 tax return and his personal 1999 tax return, both of which were filed in May 2001. He filed his 2000 income tax return in June 2003. He initially obtained an extension to file the returns but failed to obtain additional extensions. His tax returns showed a combined refund of $3523 due him for state and federal taxes for 2000.

¶ 27. The OLR's complaint also alleged that Attorney Trewin engaged in misconduct with respect to his representation of various other clients. Attorney Trewin represented A.C. in a bankruptcy filing and debt restructuring. A.C. had been represented for many years by Attorney Raymond S. Huber, who is now a Waupaca county circuit judge. During Attorney Trewin's representation of A.C., Attorney Trewin and Schommer purchased A.C.'s business, Menominee Gas, which distributed propane on the Menominee reservation. Attorney Trewin did not obtain written consent from A.C. prior to purchasing the business, and A.C. was not told that Schommer was Attorney Trewin's brother-in-law.

¶ 28. Attorney Trewin and Schommer formed Menominee Gas, Inc. It is unclear whether Huber represented A.C. in the sale of the assets of the sole proprietorship to the new corporation. The new corporation hired A.C. to manage the business and paid him a salary. A.C. was treated as a one-third owner of the new company but evidence of any ownership was avoided because his creditors could have sought to attach it. Attorney Trewin later filed a bankruptcy action for A.C. Attorney Trewin did not explain to A.C. any potential conflicts of interest in representing him in the bankruptcy after Attorney Trewin had purchased Menominee Gas assets, and Attorney Trewin failed to obtain a written consent or conflict waiver from A.C. prior to representing him in the bankruptcy action. The referee found that A.C.'s testimony was less than credible.

¶ 29. Mr. and Mrs. S. owned a restaurant in Marinette. They met with Attorney Trewin and told him they wanted to avoid bankruptcy. Attorney Trewin proposed to negotiate with their creditors and take as a fee one-third of any reduction he could obtain in their indebtedness. Attorney Trewin agreed to lend Mr. and Mrs. S. the funds to pay the reduced balance at 12 percent interest. He advised them verbally to seek independent counsel but a written conflict waiver was never prepared or signed.

¶ 30. Attorney Trewin prepared a promissory note for $80,000, two real estate mortgages, and a security agreement giving him an interest in all of Mr. and Mrs. S.'s business equipment, inventory, and fixtures. Mr. and Mrs. S. eventually sold their business and paid off their indebtedness to Attorney Trewin. Mrs. S. testified at the hearing before the referee that Attorney Trewin helped them when no one else would and that he was very fair in his dealings with them.

¶ 31. Attorney Trewin represented Mr. and Mrs. M. in 1998 and loaned them $127,000. Again, Attorney Trewin gave Mr. and Mrs. M. an opportunity to seek the advice of independent counsel but failed to obtain a written conflict waiver from them.

¶ 32. Attorney Trewin loaned Mr. and Mrs. P., bankruptcy clients, $1500 in 1999. He did not obtain a written consent or conflict waiver from them. Attorney Trewin advised Mr. and Mrs. P. that they should not reaffirm the secured debt on their house. Attorney Trewin entered into a transaction with Mr. and Mrs. P. to purchase their property and lease it back to them after their bankruptcy was completed. Attorney Trewin did not obtain a written consent or conflict waiver from Mr. and Mrs. P.

¶ 33. Attorney Trewin represented R.V.S. in a bankruptcy action. After his bankruptcy discharge, the mortgage lender on the home held a foreclosure sale. The bank's judgment was for more than the value of the house. Attorney Trewin advised R.V.S. he could let the house be sold at foreclosure, anticipating that the bank would buy the property, and then attempt to buy the house back from the bank at a lower amount. When R.V.S. could not find anyone else to buy the house or loan him money to do so, Attorney Trewin agreed to buy the home and lease it back to R.V.S. R.V.S. testified that the transaction saved him roughly $30,000 and gave him lower monthly payments than he would otherwise have had, and he said Attorney Trewin had been fair with him throughout their dealings. Attorney Trewin did not obtain written consent or a conflict waiver from R.V.S.

¶ 34. Attorney Trewin represented R.L. regarding financial problems in a potential bankruptcy filing. No bankruptcy petition was ever filed. Attorney Trewin

prepared a warranty deed that transferred ownership of R.L.'s land to Schommer and also prepared a lease/option agreement that called for R.L. to pay rent of $1100 per month to Schommer with the option of repurchasing the land. Attorney Trewin did not obtain a written conflict waiver from R.L. prior to drafting the real estate documents transferring the property from R.L. to Schommer. R.L. subsequently filed an action against Attorney Trewin and Schommer alleging he had been swindled. The referee found that R.L.'s testimony was less than credible.

¶ 35. Attorney Trewin admitted that by failing to timely file his own income tax returns he violated a supreme court decision regulating the conduct of lawyers in *State v. Roggensack,* 19 Wis. 2d 38, 45, 119 N.W.2d 412 (1963), which held that an attorney's intentional violation of the tax laws constitutes an ethics violation, contrary to SCR 20:8.4(f).[1] Attorney Trewin also admits that by depositing the October 19, 1999, check from D.S. into his business account rather than into his trust account, he violated SCR 20:1.15(a).[2]

---

[1] SCR 20:8.4(f) provides: "It is professional misconduct for a lawyer to: (f) violate a statute, supreme court rule, supreme court order or supreme court decision regulating the conduct of lawyers."

[2] SCR 20:1.15(a) provides:

> (a) A lawyer shall hold in trust, separate from the lawyer's own property, that property of clients and third persons that is in the lawyer's possession in connection with a representation or when acting in a fiduciary capacity. Funds held in connection with a representation or in a fiduciary capacity include funds held as trustee, agent, guardian, personal representative of an estate, or otherwise. All funds of clients and third persons paid to a lawyer or law firm shall be deposited in one or more identifiable trust accounts as provided in paragraph (c). The trust account shall be

Attorney Trewin takes issue with the referee's conclusions that he violated any other rules of professional conduct.

¶ 36. The referee found that Attorney Trewin violated SCR 20:1.8(a)[3] in two respects. First, the referee found a violation of the rule by virtue of Attorney Trewin's entering into lender-debtor or business relationships with at least seven clients without

maintained in a bank, savings bank, trust company, credit union, savings and loan association or other investment institution authorized to do business and located in Wisconsin. The trust account shall be clearly designated as "Client's Account" or "Trust Account" or words of similar import. No funds belonging to the lawyer or law firm, except funds reasonably sufficient to pay or avoid imposition of account service charges, may be deposited in such an account. Unless the client otherwise directs in writing, securities in bearer form shall be kept by the attorney in a safe deposit box in a bank, savings bank, trust company, credit union, savings and loan association or other investment institution authorized to do business and located in Wisconsin. The safe deposit box shall be clearly designated as "Client's Account" or "Trust Account" or words of similar import. Other property of a client or third person shall be identified as such and appropriately safeguarded. If a lawyer also licensed in another state is entrusted with funds or property in connection with an out-of-state representation, this provision shall not supersede the trust account rules of the other state.

[3] SCR 20:1.8(a) provides:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing thereto.

securing written, informed consent waivers. While Attorney Trewin admits he did not provide disclosure in writing or obtain written consent from his clients before entering into the loan agreements, he asserts this was not required. Attorney Trewin notes that SCR 20:1.8(a)(3) requires that "the client consents in writing *thereto*." He argues that the word "thereto" must refer to something earlier in the rule and the only logical conclusion is that it must refer to subsection (1) regarding consent to enter into the transaction itself and the terms on which the lawyer acquires the interest. Attorney Trewin thus argues that it is sufficient for the client to sign the loan documents and there is no need for a written waiver of any potential conflict of interest.

¶ 37. The OLR argues that the written client consent required by SCR 20:1.8(a)(3) cannot be satisfied solely by the client signing the underlying loan documents, which terms are already required to be in writing under SCR 20:1.8(a)(1). The OLR contends the rule also requires the client to consent in writing to the conflict of interest in entering into a business transaction with his or her attorney. The OLR says to interpret the rule in any other manner flies in the face of the rule's purpose, which is to ensure that the client is aware of and acknowledges all the risks and conflicts present in entering into a business transaction with an attorney with whom they have a fiduciary relationship. We agree with the OLR's interpretation.

¶ 38. It is a cardinal rule that when interpreting a statute a court must "attempt to give effect to every word, so as not to render any portion of the statute superfluous." *Osborn v. Board of Regents,* 2002 WI 83, ¶ 22, 254 Wis. 2d 266, 647 N.W.2d 158. Supreme Court

Rule 20:1.8(a)(1) requires the terms of a business transaction, i.e., the loan documents, between lawyer and client to be in writing. Attorney Trewin's argument that having the client sign the loan documents is all that is required would render the remainder of SCR 20:1.8 superfluous. Supreme Court Rule 20:1.8(a)(2) requires that before entering into a business transaction with his or her attorney the client be given a reasonable opportunity to seek advice of independent counsel. Supreme Court Rule 20:1.8(a)(3) requires that "the client consents in writing thereto." The only interpretation that would give effect to all three subsections of SCR 20:1.8(a) is that the client must give separate consent to the transaction with the lawyer, waiving the conflict of interest, and the client must indicate in writing he or she has been given a reasonable opportunity to consult with independent counsel.

¶ 39. Two prior cases in which attorneys were found to have violated SCR 20:1.8(a)(3) indicate that the rule clearly contemplates two separate writings. *See In re Disciplinary Proceedings Against Steiner,* 225 Wis. 2d 422, 429, 591 N.W.2d 857 (1999).[4] *See also In re*

---

[4] Attorney Steiner loaned money to a client. In upholding the referee's findings that Steiner violated SCR 20:1.8(a), this court said:

> That transfer constituted a loan from Attorney Steiner to [his client], made at his request, but it was not evidenced by a promissory note, and the terms of the transaction had not been provided to [the client] in writing. Also, there was no evidence suggesting that [the client] had been advised to seek the advice of independent counsel in the transaction, and Attorney Steiner did not obtain his written consent to the transaction. The loan was satisfied, and [the client] did not complain about it. The referee concluded, as the parties had stipulated, that by lending money to his client without any written terms or other documentation, without advising his client to obtain the advice of independent

*Disciplinary Proceedings Against Tritschler*, 169 Wis. 2d 298, 305, 485 N.W.2d 261 (1992).[5] Further support for our interpretation of the rule is found in the comment to SCR 20:1.7, the general conflict of interest rule which provides that a lawyer shall not represent a client if the representation will be directly adverse to another client unless the lawyer reasonably believes the representation will not adversely affect the relationship with the other client and each client consents in writing after consultation. The committee comment to this rule states, "In conflict of interest situations where the lawyer may continue to represent the client or clients if each client consents, the client's consent must be in writing, . . . ." We agree with the OLR and the referee that a separate written conflict waiver was required prior to Attorney Trewin entering into the business transactions with his clients. Attorney Trewin admits he did not obtain written consent from the clients. Thus, he violated SCR 20:1.8(a).

¶ 40. The referee also found that Attorney Trewin violated SCR 20:1.8(a) by virtue of errors made on his loan accountings to D.S. The referee made the following conclusion of law:

counsel, *and without obtaining his client's written consent,* Attorney Steiner violated SCR 20:1.8(a).

*In re Disciplinary Proceedings Against Steiner*, 225 Wis. 2d 422, 429, 591 N.W.2d 857 (1999). (Emphasis added.)

[5] In agreeing with the referee that the attorney violated SCR 20:1.8(a), this court said: "When he obtained the loan, Attorney Tritschler did not advise the clients of any actual or potential conflict of interest *nor did he obtain their written consent to continue their representation after obtaining the loan." In re Disciplinary Proceeding Against Tritschler,* 169 Wis. 2d 298, 305, 485 N.W.2d 261 (1992). (Emphasis added.)

162. The frequency and the magnitude of the loan and business transactions in which Respondent participated with his clients were such that they appeared to be a common occurrence to Respondent's practice making it look as though he was more of a banker than a lawyer. Unlike a bank, however, Respondent's mathematical accuracy when dealing with his clients in these transactions resulted in many over-charges for interest and, in some instances, billings for disbursements that either were never made or, albeit, were made at dates well after interest was shown to have accrued. None of the typical disclosure protocol a bank would follow was used by Trewin. This type of activity was unfair and unreasonable to each and every client where such activity occurred and was in violation of SCR 20:1.8(a).

¶ 41. Attorney Trewin asserts that he readily corrected the few accounting errors that were identified and that none of the errors amounted to anything more than ordinary bookkeeping mistakes. He also asserts that charging interest on credit card purchases from the dates D.S. made the purchases rather than the date Attorney Trewin paid his credit card bill was not unfair or unreasonable. He further contends that since neither D.S. nor his estate objected to using the date credit was obtained by D.S. in order to compute interest, the OLR should be barred by issue preclusion from objecting to this course of dealing.

■
¶ 42. The OLR responds to the issue preclusion argument by noting that the issue of the propriety of Attorney Trewin's loan accountings was not litigated in the circuit court and the question of whether Attorney Trewin engaged in professional misconduct by virtue of the numerous mathematical inaccuracies in his accountings to D.S. and the estate was also not litigated.

We agree with the OLR's analysis and conclude that issue preclusion does not apply here. We also agree with the referee's conclusion that Attorney Trewin violated SCR 20:1.8(a) by making numerous errors on loan accountings, apparently none of which were either identified or corrected by Attorney Trewin until after the OLR commenced its investigation. Even accepting Attorney Trewin's argument that the errors were not intentional and were simply the result of sloppy bookkeeping, they were nevertheless significant enough to constitute a violation of SCR 20:1.8(a).

¶ 43. The referee also found that by failing to include a commentary on A.C.'s one-third ownership interest in the gas company in A.C.'s bankruptcy schedules, Attorney Trewin violated SCR 20:8.4(c).[6] In addition, the referee made findings of fact that Attorney Trewin violated SCR 20:8.4(c) by assigning various loan interests to his brother-in-law, Schommer. For example, Finding of Fact 40 said that Attorney Trewin's assignment of Midwest Comics' interest in the D.S. notes to Schommer was "purely a ruse." Although the referee's conclusions of law do not specifically mention the assignments to Schommer, this court adopts the referee's findings of fact unless clearly erroneous and it reviews conclusions of law de novo. The record supports the conclusion that the assignments to Schommer violated SCR 20:8.4(c).

¶ 44. The referee also found that by entering into the lender-debtor relationship with his clients without advising them of the possible adverse consequences,

---

[6] SCR 20:8.4(c) provides: "It is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

Attorney Trewin violated SCR 20:1.7(b).[7] Attorney Trewin argues the OLR never offered any evidence of the likelihood of the alleged possible adverse effects, and he says the referee ignored evidence that such hypothetical risks were unlikely to occur. Attorney Trewin points to testimony from some of his clients that he helped them when no one else would and that he was fair in his dealings with them. The OLR argues that the creditor-debtor relationship created a relationship between Attorney Trewin and his clients in which they had differing and competing interests.

■

¶ 45. We agree with the referee's conclusion that Attorney Trewin's failure to advise his clients in writing of the possible adverse effects of entering into business relationships with them violated SCR 20:1.7(b). The rule does not require any particular degree of likelihood that adverse effects will accrue by the attorney entering into business relationships with clients. Supreme Court Rule 20:1.7(b) provides that a lawyer shall not represent a client if the representation may be materially adverse unless: "(1) the lawyer reasonably believes the representation will not be adversely affected" and "(2)

---

[7] SCR 20:1.7(b) provides:

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents in writing after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

the client consents in writing after consultation." If the lawyer believes there will be an actual adverse effect on the representation, the lawyer may not represent the client, even if the client would be willing to agree to the representation. It is only where the lawyer believes the representation will not be adversely affected *and* the client consents in writing that the representation can continue. By failing to obtain the clients' written consent before entering into the business transactions, Attorney Trewin violated the rule.

¶ 46. This court will adopt the referee's findings of fact unless they are clearly erroneous. *In re Disciplinary Proceedings Against Charlton,* 174 Wis. 2d 844, 498 N.W.2d 380 (1993). The court does not grant deference to the referee's conclusions of law and reviews them on a de novo basis. *In re Disciplinary Proceedings Against Norlin,* 104 Wis. 2d 117, 310 N.W.2d 789 (1981). The court may also impose whatever sanction it sees fits regardless of the referee's recommendation. *In re Disciplinary Proceedings Against Widule,* 2003 WI 34, 261 Wis. 2d 45, 660 N.W.2d 686. Since the referee's findings of fact have not been shown to be clearly erroneous, we adopt them. We also agree with the referee's conclusions of law.

¶ 47. The referee recommended a five-month suspension of Attorney Trewin's license to practice law in Wisconsin and also recommended that he pay the full costs of the proceeding. We agree with both of these recommendations. Attorney Trewin entered into loan transactions with clients who were experiencing serious financial problems and thus were in a vulnerable position. The fact that some of the clients thought Attorney Trewin did them a favor by loaning them money does

not exonerate him from the rule violations. We agree with the referee that there was sufficient evidence to support the conclusion that Attorney Trewin violated SCR 20:1.8(a), SCR 20:8.4(c), and SCR 20:1.7(b). In addition, Attorney Trewin has admitted to violating SCR 20:1.15(a) and SCR 20:8.4(f). We agree with the referee that a five-month suspension of Attorney Trewin's license to practice law in Wisconsin is an appropriate sanction for these violations.

¶ 48. The OLR is seeking costs in excess of $25,000. Attorney Trewin has filed an objection to the OLR's bill of costs in which he argues that the assessment of costs is discretionary. He asserts that the costs requested by the OLR that are attributable to undisputed claims of misconduct amount to only $132. He says even if the court were to find against him on any claims disputed on appeal, the reasonable costs attributable to those claims would add little as most of the underlying facts were undisputed and the vast majority of the costs incurred by the OLR relate either to claims that were dismissed and are not challenged on appeal by the OLR or were unreasonably and unnecessarily incurred in excessive and redundant discovery of undisputed facts.

¶ 49. This court has previously rejected objections to a full assessment of costs based on an apportionment of the number of misconduct allegations established. *See e.g., In re Disciplinary Proceedings Against Pangman,* 216 Wis. 2d 440, 460, 574 N.W.2d 232 (1998). We follow that past practice here and conclude that Attorney Trewin should be required to pay the full costs and fees associated with this proceeding. While the facts of the case may have been substantially undisputed, the ultimate question of whether the facts translated into

one or more violations of the rules of professional conduct was hotly contested. We find that the costs sought by the OLR were reasonably incurred in the prosecution of this case.

¶ 50. IT IS ORDERED that the license of Michael G. Trewin to practice law in Wisconsin is suspended for a period of five months, effective August 31, 2004, and until further order of the court.

¶ 51. IT IS FURTHER ORDERED that within 60 days of the date of this order, Michael G. Trewin pay to the Office of Lawyer Regulation the costs of this proceeding, provided that if the costs are not paid within the time specified and absent a showing to this court of his inability to pay the costs within that time, the license of Michael G. Trewin to practice law in Wisconsin shall remain suspended until further order of the court.

¶ 52. IT IS FURTHER ORDERED that Michael G. Trewin comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.

All work on this per curiam was completed on or before June 30, 2004. Justice Diane S. Sykes resigned on July 4, 2004.

¶ 53. DAVID T. PROSSER, J. (*concurring in part; dissenting in part*). This case raises several procedural issues that require comment.

¶ 54. On December 12, 2002, the Office of Lawyer Regulation (OLR) filed a 12–count, 48–page complaint against the respondent, Michael Trewin. The complaint asked that the respondent "be found in violation of the Supreme Court Rules as alleged," and "that the Court impose discipline commensurate with the severity of Trewin's misconduct, along with such other and further

relief as may be just and equitable, including an award of costs." The costs to the respondent, not including his own legal fees, now exceed $25,000.

¶ 55. The 12 counts in the complaint alleged violation of the following rules:

| Count 1 | Rule 20.1.8(a) |
|---------|----------------|
| Count 2 | Rule 20.1.7(b) |
| Count 3 | Rule 20.8.4(c) |
| Count 4 | Rule 20.8.4(c) |
| Count 5 | Rule 20.1.15(a) |
| Count 6 | Rule 20.1.8(a) |
| Count 7 | Rule 20.1.8(a) |
| Count 8 | Rule 20.8.4(c) |
| Count 9 | Rule 20.1.7(b) |
| Count 10 | Rule 20.8.4(f) |
| Count 11 | Rule 20.1.8(a) |
| Count 12 | Rule 10.1.7(b) |

¶ 56. The referee concluded that the respondent had violated numerous rules, but the referee's report did not neatly track the 12 counts seriatim, so that a reader could keep score of the counts that OLR proved and the counts that it did not prove. An accurate "score" would help the court evaluate the appropriate costs.

¶ 57. What is evident from this case is the following: First, the complaint against Trewin at the outset was so open-ended that he had no idea what discipline OLR was seeking, or what the potential consequences would be if he simply conceded every count. This uncertainty about likely or potential consequences provided a strong incentive for the respondent to resist the discipline.

¶ 58. Second, some of the counts charged contained *multiple* alleged violations against *multiple* clients. Consequently, unless the respondent was willing

143

to acknowledge wrongdoing to every part of every count, he had no choice but to resist some of the counts, particularly when he did not know what the consequences would be if he did not resist.

¶ 59. Third, OLR contends that Trewin should pay the entire cost of the proceeding. This means he is asked to pay the costs to prosecute him on counts on which he successfully defended himself.

¶ 60. To illustrate, OLR charged Trewin in Counts 1, 6, 7, and 11 with alleged violations of Rule 20:1.8(a). Each count alleged that Trewin entered into a business transaction or business transactions (a) the terms of which were unfair and unreasonable to the client; and (b) without obtaining the client's written approval. On each such count, the referee dismissed the allegation that the terms of the allegation were unfair and unreasonable as to the client. In retrospect, these counts were overcharged by OLR but the cost of getting them partially dismissed is to be borne entirely by Attorney Trewin. Count 9 was not proven but the cost of prosecuting that failed count is to be borne by Attorney Trewin. Allegations involving transactions with two named individuals were dismissed. Attorney Trewin is to pay for those unsuccessful allegations.

¶ 61. In *Kolupar v. Wilde Pontiac Cadillac, Inc.*, 2004 WI 112, 275 Wis. 2d 1, 683 N.W.2d 58, this court adopted the "lodestar" method for determining reasonable attorney fees under fee-shifting statutes. The court needs to ask itself whether the cost assessment in some disciplinary proceedings is consistent with the lodestar methodology, or whether it is driven by nothing more than OLR's legitimate need for funding and our cold-blooded political determination that additional costs should not be assessed to the members of the state bar.

Both of these factors are reasonable, but not if they completely override the element of fair play to a respondent attorney.

¶ 62. I concur in the discipline imposed by the court but would adjust some of the costs to reflect the respondent's success in defending himself against some of OLR's charges.