## Richmond

UPTON & WALKER V. R. D. HOLLOWAY & COMPANY.

January 22, 1920.

Absent, Whittle, P.

1. APPEAL AND ERROR—*Conflicting Evidence—Fraud—Section 6365, Code of 1919.*—In the instant case, an action of assumpsit by purchasers against seller for breach of contract, the evidence on the subject of fraud in the procurement of the contract being conflicting, the finding of the jury on that subject is final and conclusive on appeal, and, even if the case had to be reversed on other grounds, this finding would not be disturbed under the provisions of section 6365 of the Code of 1919.

2. INSTRUCTIONS—*Must be Based on the Evidence—Scintilla Doctrine.*—Since the repudiation in this State of the scintilla doctrine, it is no longer necessary to give an instruction where the evidence to support it is such that a verdict founded upon it could not be maintained. In other words, if an instruction is asked which correctly propounds the law, it should be given, if there is sufficient evidence in the cause to support a verdict found in accordance therewith. If, however, the situation is such that a verdict in accordance with a proposed instruction would have to be set aside, either, because without evidence to support it, or *plainly* contrary to the evidence, then the instruction should be refused.

3. INSTRUCTIONS—*Instruction Must be Based on the Evidence—Directing Verdict Upon Partial View of the Evidence.*—In an action of assumpsit by a buyer against seller for breach of contract, an instruction that if the seller was led into making the contract with the buyer by reason of a material misrepresentation the jury must find for the defendant is not erroneous, as directing a verdict for the defendant upon a partial view of the evidence because it ignored buyer's contention that seller ratified the contract with knowledge of the fraud, where there was not sufficient evidence in the cause to sustain a verdict in favor of buyer on the question of ratification.

4. CONTRACTS—*Ratification—Waiver—Knowledge.*—Ratification of a voidable contract involves a waiver of objection to that which

83

rendered the contract voidable, but no man will be held bound by a waiver of his rights, unless it plainly appears that he has full knowledge of his rights and a distinct intention to waive them.

5. CONTRACTS—*Fraud and Deceit—Party Must Believe Representation.*—In order for a misrepresentation to be sufficient to void a contract, it must not only have been false, but must have been believed to be true by the other party.

6. SALES—*Fraud and Deceit—Misrepresentation by Buyer—Ratification—Instructions.*—In an action of assumpsit by buyer against seller for breach of contract, the defense relied upon by seller was a material misrepresentation by the buyer. The buyer alleged that the seller with full knowledge of the fraud had ratified the contract. The evidence introduced on behalf of the buyer to show knowledge on the part of the seller of the fraud committed upon him by the buyer amounted to nothing more than a scintilla of evidence, if so much.

*Held:* That if, under these circumstances, the instructions given for seller had been modified to conform to the buyer's view as to ratification, and a verdict had been rendered in accordance therewith, holding that there had been ratification by the seller after full knowledge of the fraud perpetrated upon him, it would have been the duty of the trial court to set it aside as plainly contrary to the evidence.

Error to a judgment of the Circuit Court of city of Newport News, in an action of assumpsit. Judgment for defendant. Plaintiffs assign error.

*Affirmed.*

Upton & Walker brought an action of assumpsit against R. D. Holloway, doing business under the style of R. D. Holloway & Co., and there was a judgment for the defendant to which this writ of error was awarded. The parties occupy the same relation to each other in this court that they occupied in the trial court.

The United States government, in November, 1917, called for bids for large quantities of oats and bran for the embarkation camp at Newport News, Virginia. The bids were to be opened on November 15. The plaintiffs, who were wholesale dealers at Newport News, desiring to make

a bid for these supplies, applied to the defendant, a whole-sale broker in such supplies, for a one day option, at stated prices, on such supplies, and it was given. When the bids were opened, it was found that the plaintiffs were the low-est bidders, and it was supposed the contract would be awarded to them. It seems fairly plain that both parties understood that the option was requested and given to en-able the plaintiffs to make a bid. The call for bids required deliveries at Newport News. Supplies of this nature had to be purchased elsewhere and transported to Newport News, and the United States government had practically laid an embargo on private shipments, so that the dealers in such supplies in the western States, from which the great bulk of them had to come, would not sell and deliver them in considerable quantities except to purchasers for the use of the government who could furnish a government permit for speedy shipment. On November 19, 1917, just four days after the bids were opened, the defendant entered into a written contract with the plaintiffs to furnish them 132 carloads of oats at seventy-four cents per bushel and fifteen loads of bran at $36.00 per ton. There is serious conflict in the testimony as to what took place when this contract was entered into, and immediately preceding that time; the plaintiffs' testimony showing that they stated to the defendant that they were the lowest bidders, though the contract had not been actually made, but that they would take the oats and bran whether they got the con-tract or not, and the defendant's testimony showing that the plaintiffs stated to the defendant that they had ob-tained the contract with the government, and that he was ignorant of anything to the contrary. After this contract was entered into, the defendant made purchases in Ohio to enable him to fulfil his obligation, and the sellers there were urging him to send on the government permit for transportation, or the "serial number" of the contract, so

as to enable them to promptly forward the supplies and thus avoid warehouse or storage charges, and the defendant claims that he made similar demands upon the plaintiffs and the plaintiffs promised compliance from day to day. As the contract between the plaintiffs and the government had not in fact been entered into, they could not furnish the permit, but the defendant claims that he was ignorant of this fact and expected daily that the plaintiffs would furnish the permit to him, so that he could forward it to his shippers. Finally, on the 29th of November, the government rejected the bid of the plaintiffs and gave notice that it would accept bids on November 30, for practically the same supplies mentioned in the first call. The plaintiffs were again bidders for the same amount of supplies as they had bid for under the first call, but at increased prices. The plaintiffs were again the lowest bidders and the contract was awarded to them, and was subsequently executed by them. In the meantime, to-wit, on November 28, the defendant left for Oklahoma on a hunting trip, where he remained for two weeks; returning about the middle of December. At the time he left Virginia the defendant testified that he did not know of the rejection of the bid of the plaintiffs under the first call, nor of the call by the government for new bids. When the defendant went to Oklahoma he left an agent, W. E. Vassar, in charge of certain portions of his business.

On December 4, Vassar wired the defendant that "Walker got the last contract and is after me about the goods you sold him, but have done nothing yet. Your last intimation was that you would cancel as he did not furnish contract number. Will wait to hear from you before I deliver anything." After the return of the defendant from Oklahoma, to-wit, on December 17, 1917, the plaintiffs addressed to him a written communication, "referring to your contract dated November 19, 1917," and giving di-

rections as to the quantities and times for delivery of the supplies mentioned in the contract. To this the defendant replied on December 18, 1917, as follows: "Your favor of December 17th is received. The same shall have our attention at the proper time." On the next day the defendant repudiated the contract on the ground, as he states, that the plaintiffs had defrauded him and obtained the contract by false representations, and that he did not consider himself bound by it, and would not deliver a pound of the oats. The plaintiffs being under obligations to the government to deliver the oats and bran at specified times and prices, went upon the market and bought them at advanced prices and charged the difference to the defendant. This difference amounted to $59,668.18, for which the present action was brought.

About December 15, 1917, before defendant alleges he first discovered the fraud, he obtained from the plaintiffs $10,774.40 for eight carloads of oats then on the railroad tracks in Newport News, which was the value of the oats at 74 cents per bushel. After the alleged discovery of the fraud, the defendant refused to deliver these oats, but was compelled by the government to deliver them, without passing upon the rights of the parties, or prejudicing them in any way. Between November 19, 1917, and December 15, 1917, oats advanced in price on the market from seventy-four cents a bushel to ninety-five cents a bushel, making a difference on the eight cars of $3,057.60. The defendants denied any liability under the contract of November 19, 1917, on the ground of fraud and false representations in its procurement, and also filed a special plea under section 3299 of the Code (1904), claiming a recovery over against the plaintiffs of the sum of $3,057.60, aforesaid, for advance in the price of the eight carloads of oats. The plaintiffs denied all fraud and false representations, and further insisted that if there had been any such, the de-

fendant with full knowledge thereof had subsequently ratified the contract.   The jury found for the defendant on both defenses offered by him and rendered a verdict in his favor for the sum of $3,057.60.   It is admitted by the plaintiffs that the verdict is for the correct amount, if the finding of the jury is correct on the question of fraud and ratification.   Other facts, as far as necessary, are given in the opinion of the court.

*Lett & Massie* and *Thos. H. Willcox,* for the plaintiff in error.

*Jno. N. Sebrell, Jr.* and *S. R. Buxton* and *Nelms, Colonna & McMurran,* for the defendant in error.

BURKS, J. (after making the foregoing statement) delivered the opinion of the court.

[1] The evidence on the subject of fraud in the procurement of the contract being conflicting, the finding of the jury on that subject is final and conclusive, and even if the case had to be reversed on other grounds, this finding would not be disturbebd under the provisions of section 6365 of the new Code.   But that finding is not assigned as error in the petition for writ of error, and will be accepted as correct in the further consideration of the case.   The only errors assigned are the giving to the jury, at the request of the defendant, of instructions 2, 3 and 6, and the refusal of the court to set aside the verdict on the ground of misdirection of the jury.   As the same alleged error inheres in all three instructions and in both motions, the case will be fully disposed of by considering the objection to only one of the instructions.

[2-4] Instruction No. 2, given for the defendant, was as follows:   "The court instructs the jury that if they shall

believe from the evidence that Holloway was led into making his contract with Upton & Walker on the 19th of November by reason of any representation by Walker to the effect that Walker & Upton had been the successful bidders at the bidding of November 15th, and had been awarded a contract to furnish the government with oats and bran, and that such representation was material, they must find for the defendant." The objection urged against the instruction is that it takes only a partial view of the evidence and directs a verdict for the defendant, if the jury believe that the fraud in the procurement of the contract was proved, and wholly ignores the other contention of the plaintiffs that they were entitled to recover, notwithstanding the fraud, if, with knowledge of the fraud, the defendant ratified the contract. The plaintiffs further contended that if the omission of any reference to ratification produced a conflict between the instructions given for the plaintiffs and the defendant, respectively, they were entitled to a new trial on account of such conflict. A number of decisions of this court were cited for both propositions, but it will not be necessary to cite them. The jury was fully instructed on the subject of ratification in the instructions given at the instance of the plaintiffs.

The defendant, while not conceding the application of either of the above legal propositions to this case, insisted that there was no evidence in the cause upon which to base an instruction on the subject of ratification, and hence there was no error in failing to make any reference to it in the instructions given at the instance of the defendant. The plaintiffs insisted that there was, and to this question much of the argument of counsel, both oral and printed, was addressed.

Since the repudiation in this State of the scintilla doctrine, it is no longer necessary to give an instruction where the evidence to support it is such that a verdict founded

upon it could not be maintained. *Ches. & O. Ry. Co.* v. *Stock,* 104 Va. 97, 51 S. E. 161. In other words, if an instruction is asked which correctly propounds the law, it should be given, if there is sufficient evidence in the cause to support a verdict found in accordance therewith. If, however, the situation is such that a verdict in accordance with a proposed instruction would have to be set aside, either because without evidence to support it, or *plainly* contrary to the evidence, then the instruction should be refused. *Trotter* v. *DuPont Co.,* 124 Va. 680, 98 S. E. 621.

If there was not sufficient evidence in this cause to sustain a verdict in favor of the plaintiffs on the question of ratification, then there was no error in the instruction, and the judgment of the trial court should be affirmed. Ratification of a voidable contract involves a waiver of objection to that which rendered the contract voidable, but no man will be held bound by a waiver of his rights unless it plainly appears that he had full knowledge of his rights and a distinct intention to waive them. It is said that, "When the original transaction is infected with fraud, the confirmation of it is so inconsistent with justice and so likely to be accompanied with imposition, that the courts watch it with the utmost strictness and do not allow it to stand but on the clearest evidence." *Wilson* v. *Carpenter,* 91 Va. 183, 21 S. E. 243, 50 Am. St. Rep. 824; *Montague* v. *Massey,* 76 Va. 307.

The plaintiffs claim that the contract was ratified by the defendant's letter to them of December 18, 1917. They had written to him the day before, specifically referring to the contract of November 19, 1917, requesting delivery of the oats and bran in certain quantities and on certain dates specified in their letter, and on the next day he replied, saying: "Your favor of December 17th is received. The same shall have our attention at the proper time." This is the only ratification relied on by the plaintiffs, and

it may be conceded, as the defendant did, that it was adequate for the purpose, provided the plaintiffs could show that at that time the defendant had knowledge of the fraud which had been perpetrated upon him in the procurement of the contract. All of the other evidence of the plaintiffs on this subject was directed to the establishment of knowledge on the part of the defendant at the time he wrote that letter.

[5] In order to show knowledge on the part of the defendant the plaintiffs introduced several witnesses who testified that at the time of making the contract Mr. Walker, a member of the plaintiffs' firm, stated to the defendant that the plaintiffs had the lowest bid, though the contract had not been let, and that they would take the supplies mentioned in the contract whether they got the contract or not. These statements all refer to the item of the making of the contract and cannot be evidence of ratification of a contract obtained by fraud. If the facts be in accordance with the statements of these witnesses, then there was no fraud in the contract, and there was nothing to be waived or ratified. All of the cases agree that in order for a misrepresentation to be sufficient to void a contract, it must not only have been false, but must have been believed to be true by the other party. If, in fact, the defendant knew that the plaintiffs did not have the contract, he could not have believed to the contrary, as no one can believe that to be true which he knows to be false. So that the statements of the witnesses as to what occurred at the time of the making of the contract are not evidence of ratification of the contract, which the verdict of the jury ascertained to have been obtained by fraud. This finding of the jury is not excepted to and must be accepted as true. The testimony, therefore, with reference to what took place at the time of the making of the contract may be laid out of consideration on the question of ratification.

84

It is next sought to prove knowledge on the part of the defendant by showing that Vassar knew that the plaintiff's bid of November 15, 1917, had been rejected, and that he had communicated that fact to the defendant. To establish this fact the plaintiffs relied upon the telegram dated December 4, 1917, which was sent by Vassar to the defendant while he was in Oklahoma on his hunting trip. Vassar was not the general agent of the defendant, nor did he have anything to do with the contract of the plaintiffs except to carry out such specific orders as the defendant might give him. It is not claimed by the plaintiffs that the knowledge of Vassar was imputed to the defendant, but that he communicated the knowledge which he had on the subject to the defendant in the telegram aforesaid. This telegram was in the following words:

"Walker got the last contract and is after me about the goods you sold him but have done nothing yet. Your last intimation was that you would cancel as he did not furnish contract number. Will wait to hear from you before I deliver him anything. Did not call James about selling oats as I sold Hiden the seventy-five thousand at seventy-seven and wired shippers his contract number before they cancelled and got his check for profit. No oats on inspection track yet. Answer so I will know whether to get government order for cars on Walker's contract number. Will not do anything until I hear *from* you."

The defendant left Virginia for Oklahoma on November 28, 1917. The plaintiffs' bid of November 15th was not rejected until November 29th, so that it was impossible for the defendant to have known of the rejection of the bid before he left Virginia; and he testifies most positively that he knew nothing of the rejection of that bid. He had been daily expecting a shipping permit to be furnished him by the plaintiffs, and while at the station starting on his trip, he told P. W. Hiden to inform Vassar unless this permit

was furnished by the plaintiffs, that Vassar should sell the oats to him, Hiden. This statement was in exact accord with the testimony of the defendant that he had been urging the plaintiffs to furnish the permit and had been promised it from day to day, and was expecting it from them. The defendant testified that when he received this telegram he supposed that Vassar referred to the contract of November 15th, as that was the last contract, and the only contract of which he had any knowledge; that he knew nothing of the bid of November 30th. This statement accords with other facts shown in the case. While Vassar, in sending the telegram, had in mind the bid of November 30th, there was nothing on the face of the telegram to indicate that fact, and the defendant was in entire ignorance thereof; nor did the defendant obtain any other information on the subject until after his letter of December 18th had been written and delivered. On the morning of December 19th he learned for the first time that there had been a second bidding and that the plaintiffs had been awarded the contract under that bid. He then promptly repudiated the contract and refused to furnish any supplies thereunder. It is not deemed necessary to recite the evidence in detail, which is lengthy, but we have been unable to find anything in the language of the telegram and the evidence relating thereto, which would justify the jury in finding that the defendant knew of the plaintiffs' fraud at the time he wrote the letter of December 18, 1917.

The plaintiffs also endeavored to show knowledge on the part of the defendant by proving that Vassar had ascertained on November 28th that the plaintiffs had not secured the contract, and that he informed the defendant thereof two or three days later. Vassar testified that he learned on the 28th of November that the contract had not been awarded, and on the 29th he learned that it was refused, and he states that two or three days after the 28th

he wired Mr. Holloway, but he nowhere states that he gave the defendant any other information that the bid of November 15th had been rejected, except what was contained in the telegram. On the contrary he testifies explicitly that the first time that he told the defendant that the plaintiffs did not have the contract of November 15th was about the 18th or 19th of December. He undertakes to give the circumstances under which this information was furnished, and it sufficiently appears from other testimony that this information was conveyed to the defendant on the morning of December 19th. It is true that he states that he thought that the defendant knew that the bid of November 15th had been rejected, but he got this impression or thought from a conversation he had with Hiden with reference to what had taken place between Hiden and the defendant at the station on the morning of November 28th, when the defendant was starting on his trip to Oklahoma. The defendant sought to bring out this conversation in the testimony, but it was excluded on the motion of the plaintiffs, so that the entire conversation does not appear. Vassar testifies, however, that Hiden told him that the bids had been thrown out, "and said he saw the chief down at the station and Holloway told him to go back to the office and tell me if I did not get a permit to get the oats shipped to sell them to him." We do not see how Vassar could have got the impression from this statement that the defendant had notice that the bid of November 15th had been rejected. Not only was the bid not rejected until November 29th, but the statement that Vassar was to sell the oats to Hiden if Vassar did not get a permit to get the oats shipped, was in entire accord with the statements of the defendant that the plaintiff had been daily promising to furnish the permit and he was daily expecting it, and while he had been threatening to cancel the contract for failure to furnish the permit, still the message to Vassar indicated that

he was still willing to deliver the supplies if the permit was furnished.   Of course, no permit would be furnished if the contract was not let, and defendant's statement would seem plainly to indicate that he was in ignorance of the fact that the contract of November 15th had not been let to the plaintiffs.   The defendant himself testified in the case most explicitly and positively that Walker stated to him that the plaintiffs had the contract with the government of November 15th, and that he had no knowledge of anything to the contrary, and in fact believed that they did have such a contract until informed to the contrary by Vassar on the morning of December 19th; that he then stated to the plaintiffs that he would not furnish one pound under the contract because they had defrauded him and misrepresented the facts to him.   In opposition to the explicit and positive testimony on behalf of both the defendant and Vassar, as to the time when the defendant had knowledge of the fraud, there is opposed only the testimony of Vassar that he thought from the conversation he had with Hiden that the defendant knew that the bids of November 15th had been thrown out.   This thought of Mr. Vassar, it appears, was unwarranted and unfounded, and was a mere deduction from a conversation had with Hiden, the whole of which the defendant was not permitted to introduce in evidence on account of objections from the plaintiffs.

[6] Looking to all the evidence introduced on behalf of the plaintiffs to show knowledge on the part of the defendant of the fraud committed upon him by the plaintiffs, it amounts to nothing more than a scintilla of evidence, if so much, and the placing of the unfounded thought of Mr. Vassar against the positive evidence of the defendant.   If, under these circumstances, the instructions given for the defendant had been modified to conform to the plaintiffs' view, and the verdict had been rendered in accordance therewith, holding that there had been ratification by the

defendant after full knowledge of the fraud perpetrated upon him, it would have been the duty of the trial court to have set it aside as plainly contrary to the evidence.

For the reasons hereinbefore stated we are of opinion that no error was committed by the trial court, and its judgment must, therefore, be affirmed.

*Affirmed.*