PRESENT: Lemons, C.J., McClanahan, Powell, Kelsey, and McCullough, JJ.

JACQUELINE BOGLE MEUSE,
INDIVIDUALLY, ET AL.

OPINION BY
v. Record No. 170604        CHIEF JUSTICE DONALD W. LEMONS
OCTOBER 4, 2018

BRUCE HENRY, INDIVIDUALLY, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
Nolan B. Dawkins, Judge

In this appeal of a judgment confirming an arbitration award, we consider whether the Circuit Court of the City of Alexandria ("circuit court") erred in refusing to vacate the award under Code § 8.01-581.010.

## I. Facts and Proceedings

### A. Bogle Entities

In 1980, John Bogle ("Bogle") founded Bogle Industries, Inc. ("BII"), a real estate holding company. BII became the sole member of King Street Metro Venture, LLC ("King Street") and 4601 Eisenhower, LLC, ("4601 Eisenhower"), each of which held a commercial property in Alexandria, Virginia. BII issued 3,100 shares of preferred voting stock, which Bogle owned, and 30 shares of nonvoting common stock, which Bogle gifted to his three children, Nancy Bogle Fife ("Fife"), Jacqueline Bogle Meuse ("Meuse"), and John R. Bogle.

Bogle filed for personal bankruptcy in 1991. Pursuant to his bankruptcy plan, Bogle established the Irrevocable Bogle Trust ("Trust"), and transferred all 3,100 shares of BII's preferred voting stock to the Trust. The Trust's beneficiaries were creditors, who held a 65% interest, and a designee Bogle would choose by exercising a power of appointment to distribute the remaining 35% interest. The bankruptcy plan provided that the Trust would terminate upon Bogle's death. Bruce Henry ("Henry"), a bankruptcy attorney, represented BII and the trustee,

Stan Burns ("Burns"), in Bogle's bankruptcy. After Burns' death, the bankruptcy court appointed Paul Macdonald ("Macdonald") as successor trustee in 2001. Bogle died in 2012.

In 2003, a large loan secured by the 4601 Eisenhower property came due. Faced with a potential foreclosure, Henry and Macdonald pursued refinancing. As a condition of refinancing, the lender sought a personal guaranty from someone outside the Bogle family and to remove anyone in the Bogle family from control of the borrower. Douglas Keith Wells ("Wells"), a commercial mortgage banker who helped 4601 Eisenhower obtain refinancing, proposed that Henry serve as guarantor. Wells testified that initially, Henry was "not accepting of it," but agreed to guarantee the loan after the lender refused to drop the guarantor requirement. Henry's law firm, Henry & O'Donnell, P.C. ("Henry & O'Donnell") represented 4601 Eisenhower in the refinancing transaction.

To satisfy the condition that members of the Bogle family be removed from control of the borrower, Bogle resigned as president of BII. In addition, Henry was made manager of 4601 Eisenhower, King Street, and a new entity, Alexandria Investments, LLC ("AI") of which Bogle was the sole member. Bogle created AI in 2003 "as a vehicle to make a gift" to his daughters. Bogle exercised his power of appointment to designate AI as the beneficiary of the Trust's 35% interest in the BII preferred voting stock. Bogle then executed a deed of gift granting Meuse and Fife each 50% of his membership in AI.

Bogle executed AI's Operating Agreement, which contains a provision appointing Henry as manager of AI ("Appointment Provision"), and provides for his removal only for cause:

> 5.03 Appointment of Initial Managers. For so long as John B. Bogle (the "Founding Member") is a Member and has not consented otherwise in writing, Bruce W. Henry ("Designated Manager"), shall be the only Manager of the Company. If the Founding Member ceases to be a Member, the Designated Manager or such other Person(s) the Designated Manager

2

designates shall continue to be the only Manager of the Company, and, except for Cause, may not be removed as Manager by the Members. As used herein, "Cause" shall mean only a determination made pursuant to Section 10.01 that the Managers, with respect to the conduct of the business and affairs of the Company, have engaged in or committed willful misconduct or a knowing violation of the criminal law.

The Operating Agreement also provides for the expulsion of any member who challenges the exercise of the manager's powers or the validity of any provision of the Operating Agreement ("Forfeiture Provision"). The Forfeiture Provision does not apply to any member who has prevailed on the merits of an action seeking solely to remove the manager for cause:

11.01 Forfeiture. If any Member(s) shall, directly or indirectly, contest or dispute before any tribunal . . . the exercise by the Managers of their powers hereunder or call into question before any tribunal . . . the validity, legality or enforceability of any of the provisions of this Agreement, then, such Member(s) shall be expelled from the Company and shall cease to have any Membership Interest or any of the other rights, status or privileges of a Member . . . provided, however, the foregoing forfeiture provision shall not apply to any Member who has prevailed on the merits of an action seeking solely to remove for[ ]cause the Designated Manager or any successor Manager designated by him.

## B. Complaint

In June 2015, Meuse, individually and derivatively on behalf of the Bogle entities, filed a 14 count complaint in the circuit court against Henry, his wife Donna Henry, Henry & O'Donnell, Macdonald, and Fife ("defendants"). Meuse alleged that Henry "abused the relationships with his and his firm's clients to gain and maintain control over BII and its subsidiaries in order to enrich [his] personal financial position and his firm's financial position." She further alleged that the defendants conspired to "take over BII, convert its assets, eliminate Meuse's ownership interests, liquidate BII, and cover up their unlawful acts." The counts included liability theories for conspiracy, conversion, legal malpractice, breach of trust and

3

fiduciary duties, aiding and abetting breach of trust, and aiding and abetting breach of fiduciary duties.  Additionally, Meuse sought judicial dissolution of AI, claiming it was "not reasonably practicable to carry on the business of [AI] in conformity with its articles of organization." Alternatively, Meuse sought an order disassociating Fife and removing Henry as manager.

## C.  Consent Order

Fife moved to compel arbitration of Meuse's claims against her under the Operating Agreement's arbitration clause, which provides that all disputes "arising out of or in connection with" the Operating Agreement "shall be submitted to arbitration."  The remaining defendants subsequently moved to have the entire dispute submitted to arbitration pursuant to the arbitration provision as well.

Meuse moved to stay arbitration, arguing that the arbitration provision of the Operating Agreement was "an unenforceable agreement between a lawyer (Henry) and his clients, [AI] and former member, Jack Bogle, and current members Fife and Meuse."  Meuse asserted that the Operating Agreement was drafted by Henry's firm and named him as manager of AI.  She contended that, consequently, the arbitration provision was part of a business transaction governed by Rule 1.8(a) of the Virginia Rules of Professional Conduct ("Rule 1.8(a)"), and that the provision would be "void as against public policy" if Henry did not comply with the rule. She argued that her claims could not be submitted to arbitration, unless a jury found that Henry complied with Rule 1.8(a).

In an order dated September 3, 2015, the circuit court granted Fife's motion to compel arbitration and held that Meuse's motion to stay as to Fife was moot.  Thereafter, the parties agreed to arbitrate their dispute, and the circuit court entered a consent order referring the case to arbitration with The McCammon Group.  The order "encompasse[d] all counts and claims set

4

forth in the Complaint, and any defenses, counterclaims, or other relief relating to those counts and claims." The order required arbitration be conducted pursuant to the Uniform Arbitration Act ("Act"), Code §§ 8.01-581.01 to 581.016, and The McCammon Group's standard arbitration agreement. The order provided that nothing in The McCammon Group's standard arbitration agreement shall impair the parties' rights under Act.

### D. Discovery

In October 2015, a panel of three arbitrators ("Arbitrators") held a pre-arbitration conference call with the parties to discuss the permissible scope of discovery. Henry and Macdonald agreed to provide Meuse with all financial records related to the Bogle entities in their possession "from October 31, 2001 to the present." Meuse agreed to provide the defendants with a list of documents she was relying on in support of her claims. In accordance with their agreement, Meuse provided the defendants with the list, and Henry and Macdonald made available for inspection approximately 27,000 pages of paper records, and produced over 700 electronic files, including all accountant working papers from 1991 to 2012.

Meuse also issued requests for the production of documents by the defendants. In February 2016, Meuse wrote a letter to the Arbitrators claiming that despite meeting and conferring with the defendants, they would not produce certain documents. The defendants responded by letter that many of the documents Meuse requested had already been produced, and that many of the requests "were of unlimited subject matter" and "unlimited temporal scope."

On March 1, 2016, the Arbitrators ruled on the matters presented in the letters. The Arbitrators explained that the "rules of this arbitration, consented to by all the parties, provide 'No discovery shall be required except by the agreement of the parties or by authority of governing law.'" The Arbitrators determined that some of Meuse's requests were "not covered"

5

by the parties' discovery agreement, including requests for documents "predating October 30, 2001, other corporate records, [and] emails." The Arbitrators declined to order production of these documents, stating, "Given the limitations on discovery provided by the rules of this arbitration, we do not here order production of such documents. If either party asserts that we have authority to order further discovery, notwithstanding the rules of this arbitration, counsel may submit argument to that effect in writing."

Meuse moved for reconsideration of the Arbitrators' ruling, asserting that the decision was "based on a misunderstanding of the parties' agreement to arbitrate" because the consent order provided that nothing in The McCammon Group's standard arbitration agreement shall impair the parties' rights under the Act. She observed that Code § 8.01-581.06 of the Act empowers arbitrators to issue subpoenas for the production of documents, and urged the Arbitrators to exercise their authority to issue subpoenas pursuant to this statute. She enclosed proposed subpoenas duces tecum to each of the defendants, and asked the Arbitrators to issue them. The proposed subpoenas sought, among other things, (1) lawyer trust account records and supporting documentation pertaining to the Bogle entities, (2) certain records related to transfers of voting stock in BII, (3) communications between Fife and Henry or Macdonald, (4) documents related to payments the Bogle entities made to Fife and (5) records of AI, including "meeting minutes" and "unanimous consents."

The Arbitrators denied the request for reconsideration. They explained that "[d]iscovery is limited to matters covered by the parties' earlier agreement and to discovery otherwise provided by governing law." Applying that standard, the Arbitrators ordered production of certain documents Meuse attempted to obtain through subpoenas, and refused to order the production of other documents she also attempted to obtain through subpoenas. Specifically,

6

they ordered the defendants to produce unprivileged minutes of BII shareholder and board of director meetings from October 30, 2011 to present, "all minutes of meetings of members and/or managers" of AI from 2003 to present, and reports of transactions in Henry & O'Donnell trust accounts relating to the Bogle entities from October 30, 2001 to present. They refused to order the production of emails between Fife and Henry or Macdonald.

### E. Zaccardelli's Testimony

The Arbitrators held an eight-day evidentiary hearing in May 2016. Significant to this appeal is the testimony of Gino Zaccardelli ("Zaccardelli"), an attorney specializing in estate planning and private wealth services. Zaccardelli testified that because Henry "was going to be guaranteeing a loan related to the refinancing [of the loan to 4601 Eisenhower]," and Henry "had been [Bogle's] attorney or [was] working with [Bogle] through [BII]," "it was appropriate under the ethics rules that [] [Bogle and AI] should be advised independently," and "that was part of my role."

According to Zaccardelli, at their first meeting in March 2003, Bogle indicated that it was "very important" to BII to refinance the loan to 4601 Eisenhower. "It was something that needed to be handled properly" and "quickly" because if "the loan went into default," it "could potentially put King Street in default also." Selling the properties at a foreclosure sale "could be a terrible result to the company in that . . . it would be a forced sale at a time the company would not otherwise want to sell the properties."

With respect to Fife and Meuse, Zaccardelli stated that Bogle did not want his daughters to control BII:

> [H]e felt that having his two daughters involved in the control or
> controlling the business, we'll call it Bogle Industries or
> controlling these – well, essentially these two properties [King
> Street and 4601 Eisenhower], he wanted to give the two properties

7

> to the girls. And if they controlled the business of those two
> commercial properties, it would – he didn't feel it was a good idea.
> He didn't think that the girls would work well together. He thought
> there would be conflict.

To avoid "conflict" between his daughters, Bogle wanted Macdonald to control BII. Similarly, Zaccardelli's contemporaneous notes from the March 2003 meeting state Bogle indicated that allowing his daughters to control AI "could be set up for a big fight someday." Bogle wanted Macdonald, Henry, or another "professional" to manage AI. Additionally, Zaccardelli's notes indicate that the prospective lender wanted a "professional" to manage AI.

Counsel for Henry showed Zaccardelli a letter dated April 10, 2003 from Henry to Macdonald. In the letter, Henry recounted 4601 Eisenhower's difficulties in obtaining refinancing, given "the market's current appetite for deals with bankruptcy histories like ours." Henry stated that he submitted a draft application to Union Capital, which was predicated on the "requirement that [he] act as carve out guarantor and that Jack and the other Bogles 'become invisible' in the transaction due to the concern of Union Capital principals that without these solutions the loan would be rejected at the time of securitization, a risk they are unwilling to take."

Henry also explained that serving as guarantor constituted a business transaction between a lawyer and his client under Rule 1.8(a). He enclosed a "term sheet" with the letter to satisfy the rule's requirement that he disclose the terms under which he would participate in the transaction in writing. The terms included "[a]bsolute and irrevocable management control" of King Street, 4601 Eisenhower, and AI, and "'poison pill' provisions under which any member who files suit against the manager and is not successful will forfeit [his] membership in [these] LLC[s]."

Zaccardelli testified that he received a copy of the letter and went over the terms with Bogle. He discussed the requirement that the Bogle family become "invisible" in the transaction, which meant "they would not have control or have any position of authority" in the entities involved with the loan. Zaccardelli advised Bogle that in his view, the terms were "appropriate" and "reasonable," and stated that Bogle "understood the reason" for the terms and "was okay with them." Zaccardelli also reviewed the Operating Agreement with Bogle before its execution. Zaccardelli advised Bogle that he was "comfortable that [Bogle] could sign" the Operating Agreement. Zaccardelli testified that Bogle "fully understood" the refinancing transaction and "agreed" to execute the refinancing documents, including the Operating Agreement.

Finally, counsel for Henry showed Zaccardelli a document stating that the Bogle entities waive Henry's conflict of interest and consent to Henry acting as guarantor of the loan to 4601 Eisenhower ("waiver"). Macdonald signed the waiver on behalf of all Bogle entities except AI. The waiver contains a signature line for Bogle to sign on behalf of AI, but Bogle's signature is not on the waiver. Zaccardelli testified that he did not have "any specific memory" of seeing the waiver.

F. Expert Opinions

In support of her claims against Henry and Henry & O'Donnell, Meuse retained Lesley Haley, a legal ethics expert, and Wyatt B. Durrette, Jr., a standard of care expert for professional liability actions against Virginia attorneys. In his expert report, Durrette described the Forfeiture Provision as providing for the expulsion of a member who "sue[d] Henry before any tribunal." He opined that the Forfeiture Provision rendered AI "defenseless" if Henry "engaged in self-dealing, fraud or other misconduct." Haley opined that the Forfeiture Provision "serves to insulate Henry as to any and all actions." She acknowledged that "Bogle may have been

9

represented" by Zaccardelli in the 2003 refinancing transaction, but based on her review, "there was no indication that AI ever had independent counsel in this transaction" and "no written consent [to Henry's conflict] has been produced." Haley concluded that the "entire [refinancing] transaction was done without adequate disclosure or consent as required by Rule 1.8(a)."

## G. Arbitrators' Findings and Conclusions

The Arbitrators found in favor of the defendants on all counts. As relevant to this appeal, the Arbitrators issued "findings and conclusions" rejecting Meuse's argument that Henry violated Rule 1.8(a), and that as a consequence, the Appointment Provision was void. Observing that Bogle was represented by independent counsel, Zaccardelli, who testified that Bogle "fully understood and approved of the [refinancing] transaction," they concluded that Henry's alleged failure to comply with Rule 1.8(a) was not grounds for "invalidating the transaction thirteen years after the fact."[1] They disagreed with Meuse's argument that "Henry's failure to obtain [Bogle's] written consent voids the transaction." They noted that "no one has produced a signed

---

[1] Many of Meuse's claims were barred by the statute of limitations. In reaching this conclusion, the Arbitrators determined there was no basis for tolling the applicable statute of limitations, in part, because Meuse had previously filed a number of actions raising similar claims:

> Since at least 2005, Meuse has been asserting, in emails and voicemails, through letters of her various counsel, in a 2007 bar complaint against Henry, and in her 2007 Delaware action seeking books and records, that Macdonald and Henry have been unlawfully "milking" the BII entities through fraud, breach of fiduciary duty and excessive fees, essentially the same claims she asserts in this litigation. And she has been continuously represented by counsel during that period.

copy of [Bogle's] consent," but determined that Bogle gave informed consent and that Rule 1.8(a) is "a rule of ethics, not a rule defining liabilities."

Thereafter, the Arbitrators issued their final award, in which they granted the request of Fife and Henry to expel Meuse from AI under the Forfeiture Provision. Reiterating their previous findings, the Arbitrators found that Bogle signed the Operating Agreement after consultation and advice from Zaccardelli. Further, the Forfeiture Provision "had a reasonable purpose" in that it existed "to deter costly litigation which [Bogle] had reason to fear." The Arbitrators concluded, "On this record, it is clear that several fair and honest people, possessed of their senses, agreed to or endorsed the provision." Accordingly, the Arbitrators determined that Meuse should be expelled from AI.

Additionally, the Arbitrators awarded Fife attorney's fees and costs under Code §§ 8.01-271.1 and 13.1-1045. Code § 13.1-1045 provides that in a derivative action, "the court may require the plaintiff to pay any defendant's reasonable expenses, including reasonable attorney's fees, incurred in defending the action if it finds that the action was commenced without reasonable cause." The Arbitrators determined that Meuse lacked reasonable cause to bring her claims against Fife:

> [T]he claims against Fife had no support even from Plaintiff's own experts. The broad claims of aiding and abetting fraud, theft and conversion failed because, as accountants for both sides testified, there was no evidence of such fraud or theft. As for Fife's alleged participation in a conspiracy, Meuse essentially relied on a "pattern of Fife's communications" with Henry and Macdonald. But a pattern of communications does not amount to conspiracy, especially where a shareholder-guarantor has multiple legitimate reasons for such communication. The principal conspiratorial acts alleged against Fife consisted of guarantying loans and receiving guaranty fees. But Meuse never produced evidence that the guaranties were unnecessary or the fees unreasonable.

11

(footnotes omitted). Accordingly, the Arbitrators awarded attorney's fees and costs to Fife under Code § 13.1-1045.

The Arbitrators also premised the award of attorney's fees and costs on Code § 8.01-271.1. Code § 8.01-271.1 provides for sanctions where a claim is not "well grounded in fact" or was brought for an "improper purpose." Relying on their holdings under Code § 13.1-1045, the Arbitrators determined Meuse's claims against Fife were not well grounded in fact and were "subject to sanction on that basis alone." They also found that Meuse included Fife as a defendant "for the 'improper purpose' of vindictiveness and harassment." The Arbitrators determined that Meuse sued Fife, in part, as "personal payback" based on the longstanding "personal antagonism between the two sisters," Meuse's testimony that "she and her sister had ceased speaking to one another in 2005," and the ongoing litigation over the administration of Bogle's estate in which Meuse alleges Fife rewrote Bogle's will. The Arbitrators determined that Fife's request for $900,900 in attorney's fees and $8,300 in costs was reasonable and directed Meuse to pay Fife $909,200.

## H. Circuit Court Confirms Award

The defendants moved to confirm the arbitration award in circuit court. Meuse opposed the motion and filed an application to vacate the award, in part,[2] on the ground that the Arbitrators "exceeded their authority" by "enter[ing] an award that violates public policy." Meuse argued that the Forfeiture and Appointment Provisions "violate[] public policy in that [they] do not comply with Rule 1.8(a)," and, consequently, the Arbitrators "exceeded their

---

[2] The portions of the arbitration award Meuse did not challenge include the dismissal of all claims against Donna Henry. Although Donna Henry is not a party to this appeal, Meuse challenges the Arbitrators' refusal to issue subpoenas duces tecum to all defendants. As a result, it is necessary to distinguish between defendants (all of the parties named as defendants in the complaint) and appellees (all defendants except Donna Henry).

authority" by enforcing these provisions. She also argued that the Arbitrators "exceeded their authority" and "refuse[d] to hear evidence material to the controversy" by "disregard[ing] their broad authority to issue subpoenas duces tecum under Virginia Code § 8.01-581.06." Finally, Meuse argued the award of attorney's fees and costs to Fife must be vacated because "the subpoenas [the Arbitrators] refused to issue were [] material to whether Meuse had 'reasonable cause' to commence her claim and whether it was 'well-grounded' in fact."

After hearing argument on the motions, the circuit court entered a final order confirming the award in its entirety and denying the application to vacate the award. Meuse appealed to this Court, and we granted an appeal on the following assignments of error:

1. The Circuit Court erred when it (a) refused to vacate that portion of the Arbitrators' award that expelled Meuse from membership in Alexandria Investments, and (b) confirmed and entered judgment on that portion of the award. The Arbitrators exceeded their powers because the Forfeiture Provision of the Operating Agreement on which they relied violates Rule 1:8(a) of the Rules of Professional Conduct and, thus, violates public policy and is unenforceable.

2. The Circuit Court erred when it (a) refused to vacate that portion of the Arbitrators' award that validated ¶ 5.03 of the Operating Agreement ("the Perpetual Control Provision") and (b) entered judgment on that portion of the award. The Arbitrators exceeded their powers because the provision of the Operating Agreement on which they relied violates Rule 1:8(a) and, thus, violates public policy and is unenforceable.

3. The Circuit Court erred when it (a) refused to vacate the Arbitrators' decision to rule against Plaintiffs on the contested portions of the Award (*i.e.*, Counts II-VII and X-XII, as well as fees and costs to Fife, AI and BII), and (b) confirmed and granted judgment on those portions of the award. The Arbitrators "exceeded their powers" and "refused to hear evidence material to the controversy [and] so conducted the hearing, contrary to the provisions of § 8.01-581.04, in such a way as to substantially prejudice the rights of [Meuse]," all in violation of Code § 8.01-581.010.

13

4. The Circuit Court erred when it (a) refused to vacate the Arbitrators' decision to impose $909,200 in attorneys' fees and sanctions on Meuse under Code §§ 13.1-1045 and § 8.01-271.1, and (b) confirmed and granted Nancy Fife judgment in said sum. The Arbitrators "exceeded their powers" and "refused to hear evidence material to the controversy [and] so conducted the hearing, contrary to the provisions of § 8.01-581.04, in such a way as to substantially prejudice the rights of [Meuse]," all in violation of Code § 8.01-581.010.

## II. Analysis

### A. Standard of Review

"A circuit court's review of an arbitration award is limited to the specific statutory criteria contained in [the] Act." *Signal Corp. v. Keane Federal Systems, Inc.*, 265 Va. 38, 45 (2003). Therefore, a circuit court's denial of an application to vacate an arbitration award under the Act presents a question of statutory interpretation, which we review de novo. *Chamberlain v. Marshall Auto & Truck Ctr., Inc.*, 293 Va. 238, 242 (2017). "[T]he party attacking an arbitration award 'bears the burden of proving the invalidity of the award.'" *Bates v. McQueen*, 270 Va. 95, 100 (2005) (quoting *Trustees of Asbury United Methodist Church v. Taylor & Parrish, Inc.*, 249 Va. 144, 153 (1995)).

### B. AI Operating Agreement

In the first and second assignments of error, Meuse asserts that the circuit court erred by refusing to vacate the portions of the arbitration award that "validated" the Appointment and Forfeiture Provisions. She has confined her challenge to subsection three of Code § 8.01-581.010 of the Act, which provides that an arbitration award shall be vacated where "[t]he arbitrators exceeded their powers." She argues that the Forfeiture and Appointment Provisions violate public policy because Henry failed to comply with Rule 1.8(a), and as a result, the Arbitrators exceeded their powers by enforcing these provisions.

14

"In determining whether the arbitrators exceeded their authority pursuant to Code § 8.01-581.010(3), the issue we decide is not whether the award is legally correct. We decide only whether the arbitrators had the power to decide the parties' [] claims." *BBF, Inc. v. Alstom Power, Inc.*, 274 Va. 326, 330 (2007). This is because Code § 8.01-581.010 provides that "[t]he fact that the relief was such that it could not or would not be granted by a court of law or equity is not grounds for vacating or refusing to confirm the award."

We have vacated an arbitration award under Code § 8.01-581.010(3) only once, in the *Trustees* case. There, the parties' contract provided that disputes arising out of certain "contract documents," which were identified, would be arbitrated. 249 Va. at 153. The arbitrator decided a claim arising out of a written change order document that was not among the identified documents. *Id.* at 154. We explained that "[a]rbitrators derive their authority solely from the parties' contractual agreement to arbitrate disputes arising under the contract. Thus, arbitrators exceed the scope of their authority when they purport to act beyond the terms of the contract from which they draw their authority." *Id.* at 153. We concluded that the arbitrator exceeded his powers by deciding a claim that was not within the scope of the parties' agreement to arbitrate. *Id.* at 154.

We held that Code § 8.01-581.010(3) did not require vacating an arbitration award in *Signal Corp.* and *BBF*. In *Signal Corp.*, we considered whether arbitrators exceed their powers by entering an award that "exhibit[s] a 'manifest disregard of the law.'" 265 Va. at 46. Citing the Supreme Court of Michigan with approval, we observed that "an allegation that the arbitrators have exceeded their powers must be carefully evaluated in order to assure that this claim is not used as a ruse to induce the court to review the merits of the arbitrators' decision." *Id.* (quoting *Gordon Sel-Way, Inc. v. Spence Bros., Inc.*, 475 N.W.2d 704, 710 (Mich. 1991)).

15

Noting that the words "manifest disregard of the law" were "[c]onspicuously missing" from Code § 8.01-581.010, we refused to examine "whether the arbitrators' conclusions were legally correct." *Id.* at 45-46. We held that "the arbitrators did not exceed their powers because the issues that they resolved were within the scope of the powers conferred upon the arbitrators" by the parties' agreement to arbitrate. *Id.* at 45.

In *BBF*, we considered whether arbitrators exceeded their powers by awarding liquidated damages that, according to BBF, were "a violation of 'clear public policy.'" 274 Va. at 329. BBF argued the award violated public policy because "Virginia law prohibits an award of liquidated damages to a party who has suffered no actual damages." *Id.* at 329. We explained that by agreeing to arbitrate their contract dispute, the parties "empowered the arbitrators to award liquidated damages." *Id.* at 331. Accordingly, in this limited context, we held that "BBF's claim that the award of liquidated damages violated public policy does not state a ground for vacating an arbitration award contained in Code § 8.01-581-010." *Id.*

The appellees argue that "Meuse's appeal is a direct call for the reversal of *BBF*." While we agree that Meuse has not stated a ground for vacating an arbitration award contained in Code § 8.01-581.010, we disagree with the appellees' argument that *BBF* is controlling authority. *BBF* did not wholly displace the common law rule that "[i]f a contract violates public policy, it is void and of no legal effect." *Shuttleworth, Ruloff & Giordano, P.C. v. Nutter*, 254 Va. 494, 497 (1997). "It is an undoubted principle of the common law, that it will not lend its aid to enforce a contract to do an act that is illegal; or which is inconsistent with sound morals or public policy; or which tends to corrupt or contaminate, by improper influences, the integrity of our social or political institutions." *Steele v. Drummond*, 275 U.S. 199, 204 (1927).

16

While this principle is "readily understood, its right application is often a matter of much delicacy." *Id.* at 205. "The meaning of the phrase 'public policy' is vague and variable; there are no fixed rules by which to determine what it is." *Id.* For purposes of applying this principle to agreements subject to statutory arbitration, however, the role of public policy must have defined boundaries. Public policy is a hotly debated topic, both in federal and state courts, *see generally* Stephen Wills Murphy, Note, *Judicial Review of Arbitration Awards Under State Law*, 96 Va. L. Rev. 887, 918-27 (2010), and the issue can arise at the front and back ends of an arbitration proceeding.

At the front end, a party can avoid being sent to arbitration by proving that the arbitration agreement is invalid, unenforceable, or revocable on "such grounds as exist at law or in equity for the revocation of any contract." Code § 8.01-581.01; *see also* 9 U.S.C. § 2; Unif. Arbitration Code § 6 (Unif. Law Comm'n 2000). Therefore, a voidable or a void-ab-initio arbitration agreement that is worthy of judicial revocation can be challenged under Code § 8.01-581.01, just as any similar agreement without an arbitration clause could be judicially challenged on the same grounds.

Public policy challenges, however, can also arise at the back end of an arbitration proceeding. A party losing in arbitration could assert for the first time (having not raised a pre-arbitration challenge under Code § 8.01-581.01) that the arbitration award should be judicially vacated because the underlying agreement violated public policy. To the extent such a challenge, if successful, would merely render the agreement voidable, *BBF* held that an arbitration award enforcing the agreement cannot be judicially vacated under Code § 8.01-

17

581.010(3).[3]  However, *BBF* did not address, much less hold, that courts had no power to vacate arbitration awards attempting to enforce agreements that are void ab initio.

"A legal transaction deemed void ab initio can be challenged by any person, in virtually any proceeding, for any reason precisely because the transaction, in the eyes of the law, does not exist." *Levick v. MacDougall*, 294 Va. 283, 300 (2017) (citing *Singh v. Mooney*, 261 Va. 48, 52 (2001); *Toler v. Oakwood Smokeless Coal Corp.*, 173 Va. 425, 432 (1939)).  An agreement to commit a crime, for example, would be void ab initio.  *See, e.g.*, *Harris v. Harris*, 64 Va. (23 Gratt.) 737, 755 (1873) (noting that "a contract to tempt a man to commit a crime" is "void ab initio" (citation omitted)); *Starke v. Littlepage*, 25 Va. (4 Rand.) 368, 372 (1826) ("[I]f a man be bound upon condition to commit a crime, the contract may be avoided by the defendant."); *see also* 1 Arthur Linton Corbin, Corbin on Contracts § 1.7, at 21 (Joseph M. Perillo ed., rev. ed. 1993) (noting that "an agreement by two parties for the doing of acts that both know to be a felony would have no legal operation and be 'void'").  Nothing in Code § 8.01-581.010 or our cases interpreting it suggest a court could not vacate an arbitration award enforcing a void ab initio contract.

_____

[3] Fraud in the inducement, for example, renders a contract voidable based upon an ancient and important public policy.  *See Wilson v. Hundley*, 96 Va. 96, 100-01 (1898).  But a litigant can implicitly waive that claim by not asserting it in litigation and can expressly waive that claim by ratifying the contract and seeking a recovery on it.  *See, e.g.*, *Upton & Walker v. R.D. Holloway & Co.*, 126 Va. 657, 664 (1920).  The same can be said of claims that a contract was the product of duress, unconscionability, or inadequate consideration, or, as in *BBF*, a claim that a contract attempted to impose legally unenforceable liquidated damages.  None of these "public policy" challenges can be asserted for the first time in a post-arbitration challenge under Code § 8.01-581.010.  They must be addressed, if at all, in a pre-arbitration challenge pursuant to Code § 8.01-581.01.

With these principles in mind, we turn to Meuse's argument that enforcement of the Forfeiture and Appointment Provisions constitutes a violation of public policy under Rule 1.8(a). Rule 1.8(a) provides:

> A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
>
> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
>
> (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
>
> (3) the client consents in writing thereto.

Meuse contends that Henry failed to comply with three parts of this rule. First, she argues that the Forfeiture and Appointment Provisions are not fair and reasonable because they provide Henry with "a death grip" over AI and "prohibit any challenge to [his] actions." This argument overlooks the fact that the Appointment Provision provides that the manager can be removed for cause, and that the Forfeiture Provision does not apply to any member "who has prevailed on the merits of an action seeking solely to remove for cause the Designated Manager." Further, Meuse has not addressed the Arbitrators' finding that "Henry agreed to the guaranty as a matter of necessity." The Arbitrators found that the lender "demanded" a personal, multimillion dollar guaranty from someone other than "a Bogle," and there was "no evidence that anyone else was willing or able" to serve as guarantor. The lender also required anyone in the Bogle family to be removed from control of the borrower, and Bogle did not want his daughters to control AI. Based on these facts, we conclude that the Forfeiture and Appointment Provisions are fair and

19

reasonable to AI. Consequently, Meuse's challenges fail to establish that these provisions of the agreement are void ab initio.

Second, Meuse argues that the terms Henry provided in his April 10, 2003 letter were misleading. In the letter, Henry requested "'poison pill' provisions under which any member who files suit against the manager and is not successful will forfeit their membership in the LLC." Meuse claims this description is misleading because under the Forfeiture Provision, "any member who sues the manager for financial accountability loses membership regardless of the outcome." As previously noted, the Forfeiture Provision does not apply to any member who prevails on the merits of an action seeking solely to remove the manager for cause. Meuse also claims Henry's request for "[a]bsolute and irrevocable control" of AI "at least until the carve out guaranty liability is released" is misleading because the Appointment Provision designated Henry as manager indefinitely. Zaccardelli reviewed the Operating Agreement and other refinancing documents with Bogle before their execution. Zaccardelli gave Bogle comments on the documents, "told [Bogle] [he] was comfortable that [Bogle] could sign them," "[a]nd [Bogle] agreed and signed them." Consequently, Meuse has not established that Bogle was misled by any differences between the terms in the letter and the Operating Agreement. Here again, Meuse's argument on this point fails to establish any void-ab-initio basis for refusing judicial enforcement of the arbitration award.

Third, Meuse asserts that Henry failed to obtain Bogle's consent in writing because no one has produced a signed copy of the conflict waiver. [4] While Rule 1.8(a) requires a lawyer to obtain his client's consent in writing, Henry's alleged failure to comply with this requirement

---

[4] It is not entirely clear whether Bogle ever signed the conflict waiver. Although the Arbitrators noted that "no one has produced a signed copy of [Bogle's] consent," they did not make a factual finding regarding whether Bogle signed the conflict waiver.

does not constitute a violation of public policy that renders the Appointment and Forfeiture provisions unenforceable. The purpose of Rule 1.8(a) "is to ensure that the client is aware of and acknowledges all the risks and conflicts present in entering into a business transaction with an attorney with whom they have a fiduciary relationship." *Office of Lawyer Regulation v. Trewin*, 684 N.W.2d 121, 130 (Wis. 2004). In this case, the Arbitrators found that Bogle gave "informed consent" to the terms of the guaranty. This conclusion is supported by Zaccardelli's testimony that he discussed Henry's conflict with Bogle "quite a bit" and that Bogle "fully understood and appreciated what was going on." Because the purpose of Rule 1.8(a) was satisfied, the failure to obtain the client's signature does not constitute a violation of any public policy, much less one rendering the challenged agreement void ab initio. Accordingly, we hold that the circuit court did not err by refusing to vacate the portions of the arbitration award that uphold the Forfeiture and Appointment Provisions of the Operating Agreement.[5]

---

[5] Additionally, we agree with the Arbitrators' observation that "Rule 1.8 is a rule of ethics, not a rule defining liabilities."

> Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.

Va. Sup. Ct. R., Part 6, § II, Preamble. Meuse maintains that provisions of the Operating Agreement are unenforceable based upon an alleged violation of Rule 1.8(a). Such a holding

C. Subpoenas Duces Tecum

In support of the third assignment of error, Meuse asserts that the Arbitrators erred by refusing her request to issue subpoenas duces tecum to the defendants. As a consequence, she contends the award must be vacated under subsections three and four of Code § 8.01-581.010.

i. Code § 8.01-581.010(3)

According to Meuse, the Arbitrators refused to issue subpoenas duces tecum to the defendants because The McCammon Group's arbitration rules did not authorize them to order the production of documents, absent the parties' agreement to conduct discovery. Meuse contends that this was error because "arbitrators may issue subpoenas" under Code § 8.01-581.06, and the consent order provides that nothing in The McCammon Group's standard arbitration agreement shall impair the parties' rights under the Act.

Meuse's factual portrayal of the Arbitrators' reasons for refusing to issue subpoenas is contradicted by the record. The ruling denying the request to issue subpoenas states: "Discovery is limited to matters covered by the parties' earlier agreement and to discovery otherwise provided by governing law." The phrase "otherwise provided by governing law" demonstrates that the Arbitrators recognized their statutory authority to issue subpoenas, and that their refusal to issue them was an exercise of their authority. Therefore, we hold that the Arbitrators did not exceed their powers under Code § 8.01-581.010(3) by declining to issue subpoenas.

ii. Code § 8.01-581.010(4)

Code § 8.01-581.010(4) requires an arbitration award to be vacated where "[t]he arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused

---

would undermine the well-established boundary between the disciplinary objectives of the Rules of Professional Conduct and the remedial objectives of common and statutory civil law.

to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of § 8.01-581.04, in such a way as to substantially prejudice the rights of a party." Code § 8.01-581.04 provides in pertinent part that "[t]he parties are entitled to be heard, to present evidence material to the controversy and to cross-examine witnesses appearing at the hearing."

We have vacated an arbitration award under Code § 8.01-581.010(4) only once, in the *Bates* decision. There, the arbitrators decided the dispute without holding a hearing or affording the parties an opportunity to present evidence. 270 Va. at 101. Observing that a hearing is a "fundamental part of the arbitration process," we determined that "the failure to conduct 'the hearing' clearly intended by the terms of Code § 8.01-581.04, unless otherwise provided by an agreement, and by the provisions of Code § 8.01-581.010(4) was tantamount to no arbitration." *Id.* at 102. Accordingly, we vacated the arbitration award and remanded for further proceedings with instructions that the trial court order a hearing before the original arbitrators or their successors. *Id.* at 103.

Meuse asserts that the Arbitrators "refused to hear evidence material to the controversy" by "their wholesale refusal to [issue] subpoena[s]." Meuse has not explained why she equates a refusal to issue subpoenas with a refusal to hear evidence. However, because she claims that the refusal to issue subpoenas "barred [her] from obtaining" material evidence, she appears to argue that her inability to present material evidence amounts to a refusal by the Arbitrators to hear such evidence. This argument is merely an attempt to turn Meuse's dissatisfaction with the Arbitrators' discovery rulings into a challenge under Code § 8.01-581.010(4). This statute is not a vehicle for challenging the scope of discovery in arbitration proceedings. The Arbitrators'

refusal to issue subpoenas was an exercise of their discretion that does not implicate Code § 8.01-581.010(4).

Furthermore, as the Arbitrators observed, Meuse had access to "a mountain of documents," due to the defendants' agreement to provide "all financial records in the possession of Macdonald or Henry from October 30, 2001 to October 2015." The Arbitrators noted that while "Meuse continues to complain of gaps in production, her complaints are not borne out by others." The Arbitrators explained:

> BII's tax preparer confirmed that corporate records were sufficient to account for all material transactions. Defendant's expert, Joseph Estabrook, confirmed that BII's financial records were adequate for managing the business and that all transactions were accurately recorded. Although Meuse's expert, Barry Strickland, criticized BII's financial accounting system, he nevertheless found that the work papers of BII's independent accountants provided "enough information . . . to facilitate our review and analysis." Finally, the extraordinary length and complexity of Meuse's pleadings, and the thorough and detailed presentation of documents by her counsel both before and during the hearing, belie any lack of material information.

(footnote omitted). Meuse has not presented any compelling reason to disturb the Arbitrators' finding that she did not lack any material information. Accordingly, we hold that the Arbitrators did not "refuse[] to hear evidence material to the controversy" under Code § 8.01-581.010(4).

### D. Attorney's Fees and Costs

In the fourth assignment of error, Meuse asserts that the Arbitrators "exceeded their powers" and "refused to hear evidence material to the controversy," in violation of subsections three and four of Code § 8.01-581.010, by awarding attorney's fees and costs to Fife. Meuse argues that because Fife supported enforcement of the Forfeiture and Appointment Provisions, holding those provisions are void based on the first and second assignments of error "will

24

significantly diminish Fife's status as a prevailing party, thus making a full fee award inappropriate." We have already determined that those provisions are not void.

Moreover, the award of attorney's fees and costs was not based on Fife's status as a prevailing party. The award was based on the Arbitrators' finding that Meuse "commenced [her] action against Fife without reasonable cause" under Code § 13.1-1045. Additionally, the Arbitrators found that "Meuse's claims against Fife are not well grounded in fact and were brought for the improper purpose of vindictiveness and harassment" under Code § 8.01-271.1.

Meuse also argues that the Arbitrators based the award of attorney's fees and costs on "Meuse's failure to produce the evidence that they refused to subpoena." This argument presumes that if the Arbitrators issued subpoenas duces tecum, Meuse would have obtained documents that support her claims. Code § 13.1-1045 provides that a court may require the plaintiff to pay the defendant's attorney's fees "if it finds that [a derivative] action was commenced without reasonable cause." Under Code § 8.01-271.1, an attorney or party's signature on a pleading certifies that "to the best of his knowledge, information and belief, formed after reasonable inquiry," the pleading "is well grounded in fact" and "is not interposed for any improper purpose." The temporal focus of both of these statutes is the time an action is filed. A plaintiff cannot satisfy these statutes by filing an action with the expectation that discovery will uncover support for his claims. Accordingly, we reject Meuse's argument that the Arbitrators refusal to issue subpoenas establishes that the award of attorney's fees and costs must be vacated.

### III. Conclusion

Having reviewed the issues raised by Meuse, we find no basis in law or fact for reversing the circuit court's confirmation of the arbitration award. Meuse has presented this Court with a

litany of arguments in support of her claim that Henry did not comply with Rule 1.8(a), but as we have explained at length, none of Meuse's arguments are supported by the facts of this case. With respect to Meuse's fixation with the absence of a conflict waiver signed by Bogle, who passed away years before this action was commenced, we note the record demonstrates that, at a minimum, Henry substantially complied with the Rules of Professional Conduct. Any failure to obtain Bogle's consent in writing does not rise to the level of a violation of public policy that requires voiding portions of a contract. Accordingly, we will affirm the circuit court's confirmation of the arbitration award.

*Affirmed.*